******************************************************

The "officially released" date that appears near the be-
ginning of each opinion is the date the opinion will be pub-
lished in the Connecticut Law Journal or the date it was
released as a slip opinion. The operative date for the be-
ginning of all time periods for filing postopinion motions
and petitions for certification is the "officially released"
date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecticut
Reports and Connecticut Appellate Reports. In the event of
discrepancies between the advance release version of an
opinion and the latest version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is to
be considered authoritative.

The syllabus and procedural history accompanying the
opinion as it appears in the Connecticut Law Journal and
bound volumes of official reports are copyrighted by the
Secretary of the State, State of Connecticut, and may not
be reproduced and distributed without the express written
permission of the Commission on Official Legal Publica-
tions, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* METESE HINDS
## (SC 20555)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Alexander, Js.

*Syllabus*

Convicted of the crimes of murder and carrying a dangerous weapon in connection with the stabbing death of the victim, the defendant appealed to this court. The defendant had been staying with his friend L in L's apartment. On the evening of the murder, the victim, J, and another individual were consuming alcohol and drugs in J's apartment, which was on the floor above L's apartment. At some point that evening, the defendant, who was highly intoxicated, entered J's apartment and began arguing with the victim. J then expelled both men from her apartment. Soon thereafter, J learned that the victim had been in a fight, and she immediately went to the floor on which L's apartment was, where she found the victim, who had been stabbed multiple times. The police subsequently arrived at the scene, and, while they were attending to the victim, the defendant emerged from L's apartment and started kicking the victim and yelling. During a search of L's apartment, the police found a knife on the kitchen floor lying next to a pool of blood. It was later determined that the knife had both the victim's and the defendant's DNA on it. Following the incident, the police interviewed the defendant on two occasions. Over the course of those interviews, the defendant repeatedly changed his version of the events, stating first that he did not know the victim, but later stating that he fought with the victim, whom he knew, after confronting him about the victim's alleged sexual assault of J's daughter. The defendant also stated that he was attacked by the victim and his "crew," forcing him to fight with up to ten individuals at once. At trial, L testified that, after the defendant returned to L's apartment on the evening of the murder, he heard the defendant rummaging through a drawer in the kitchen and then saw him leave the apartment and engage in a physical altercation with the victim on the fire escape landing outside of L's apartment. L further testified that, when the victim collapsed, the defendant reentered L's apartment, and L observed that the defendant was holding a knife from the kitchen drawer. During closing argument, the prosecutor argued that the evidence overwhelmingly established the defendant's guilt, despite some discrepancies between the testimony of certain witnesses, and that the jury could infer that L's prior statements to the police, which L had given on the night of the victim's murder but were not in evidence, were consistent with his trial testimony because, otherwise, the defense would have used the statements to impeach him, as it had with respect to the prior statements of two of the state's other witnesses. Defense counsel did not object to these remarks by the prosecutor. During his closing argument, defense counsel argued that the state had failed to prove beyond a reasonable doubt that it was the defendant, as opposed to some other person, who murdered the victim and that the jury should not credit L's testimony because, inter alia, he had entered into a cooperation agreement with the state. During his rebuttal argument, the prosecutor referred to Occam's razor, the principle that the simplest of competing theories should be preferred over more complex ones, in arguing that the jury should credit the state's simple, straightforward version of events rather than the defendant's unreal, complex story. Defense counsel did not object to this reference either. On appeal, the defendant claimed that he was deprived of his due process right to a fair trial as a result of the prosecutor's allegedly improper remarks during closing and rebuttal arguments. *Held* that the defendant could not prevail on his claim that the prosecutor's references during closing argument to L's prior statements to the police and during rebuttal argument to Occam's razor constituted prosecutorial impropriety that deprived the defendant of his right to a fair trial: the prosecutor did not improperly reference facts not in evidence or vouch for L's credibility by inviting the jury to infer that L's prior statements to the police were consistent

with his trial testimony, as L and two other witnesses testified that L had given statements to the police, and the jury was aware that certain other state witnesses had given statements to the police and that the defense had used their statements to discredit them, and, therefore, the prosecutor merely was asking the jurors to infer from evidence properly before them, and from their personal experience as jurors in this case, that, if L had changed his story as a result of his cooperation agreement, the defense could and would have used his prior statements to discredit him; moreover, the prosecutor's reference to Occam's razor did not improperly dilute the state's burden of proof or otherwise mislead the jury as to the nature of that burden, as it was used as a rhetorical device in response to defense counsel's closing argument that the jury must choose between the state's and the defendant's competing versions of events, and nothing in the prosecutor's remarks expressly or implicitly suggested to the jurors that they must choose the simpler version of events, even if they did not find it proven beyond a reasonable doubt; furthermore, even if the prosecutor's remarks were improper, there was no possibility that they deprived the defendant of a fair trial, as each of the alleged improprieties occurred only once, neither was perceived by defense counsel as being so severe as to warrant an objection or a request for curative measures, this court did not perceive them as being severe, the state's case was strong, and the trial court's instructions pertaining to the jurors' exclusive role as the arbiters of credibility, the state's burden of proof, and the principle that jurors must confine themselves to the evidence in the record were more than adequate to counteract any harm resulting from the alleged improprieties.

Argued May 5—officially released August 30, 2022

*Procedural History*

Substitute information charging the defendant with the crimes of murder and carrying a dangerous weapon, brought to the Superior Court in the judicial district of New London and tried to the jury before *Kwak, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom were *Thomas M. DeLillo*, senior assistant state's attorney, and, on the brief, *Paul J. Narducci*, state's attorney, for the appellee (state).

*Opinion*

ALEXANDER, J. Following a jury trial, the defendant, Metese Hinds, was convicted of murder in violation of General Statutes § 53a-54a (a) and carrying a dangerous weapon in violation of General Statutes § 53-206 (a). On appeal,[1] he claims that two instances of prosecutorial impropriety, which occurred during the state's closing and rebuttal arguments, deprived him of his due process right to a fair trial. We disagree and affirm the judgment of conviction.

The following facts, which the jury reasonably could have found, and procedural history are relevant to our resolution of this appeal. In October, 2017, the defendant was staying with his childhood friend, James Cody Lewis, in a one bedroom apartment on Blackhall Street in New London. The apartment was located on the second floor of a three-story building. From the street, access to the second and third floor apartments was via a green steel fire escape that zigzagged across the front of the building.

Jacquelinnes Lopez and her infant daughter lived in the apartment above Lewis' apartment. In the early evening hours of October 24, 2017, Raheeim General (victim), Justice Rodriguez, and Lopez were together in Lopez' apartment drinking, smoking marijuana, and listening to music. All three individuals were extremely intoxicated as a result of having consumed a gallon of vodka, in addition to other alcoholic beverages, over the course of several hours. Jennifer Beard, Lopez' sister, was also present but was in the bedroom with her three year old son and Lopez' daughter. Beard was not drinking. At some point, the defendant showed up highly intoxicated and asked the victim for a shot of liquor. The victim obliged, but soon he and the defendant began arguing, prompting Lopez to kick all three men—the victim, Rodriguez, and the defendant—out of the apartment. Fifteen or twenty minutes later, someone knocked on Lopez' door to inform her that the victim—Lopez' best friend since childhood and the godfather to her daughter—had been in a fight. Lopez immediately ran down the fire escape stairs to the second floor landing, where she found the victim lying there "lifeless."

Shortly before Lopez found the victim, Lewis was awakened by loud pounding on his front door. Lewis had spent the entire day sleeping after having been awake for three days straight playing video games and smoking crack cocaine. When Lewis opened the door, the defendant entered the apartment in an extremely agitated state and said, "they're touching the kids. I'm gonna kill them all." At the exact same moment, Rodriguez appeared in the doorway, and he and the defendant began to fight on the landing. After a few seconds, Rodriguez retreated up the stairs to Lopez' apartment,

whereupon the defendant reentered Lewis' apartment, walked directly to the kitchen, and began rummaging through a drawer. The defendant then left the apartment through the front door.

The victim was standing on the second floor landing when the defendant came out of the apartment. Lewis watched as the two men began "tousling" and "throwing punches . . . ." He then saw the defendant thrusting his right hand back and forth "in an upward motion" into the victim's body, until the victim fell to the ground. After the victim collapsed, the defendant reentered Lewis' apartment and shut the door. It was then that Lewis observed that the defendant was holding a knife from his kitchen drawer. He also noticed that the defendant was bleeding from a wound to the back of his leg. When the police arrived, the defendant came out of Lewis' apartment and "started kicking" the victim, yelling "die, pussy, die." Later that evening, Lewis consented to a search of his apartment and provided the police with a sworn statement about the events of that evening.

At the time of the murder, Lisbeth Guzman was living at the corner of Blackhall and Belden Streets, across the street and a few buildings down from Lewis' building. On the night in question, she and her friend, Isiah Brown, were together after work when they heard loud arguing in the street. After a few minutes, the two friends stepped out onto Guzman's fire escape to see what was happening. From the fire escape, they saw a tall, skinny man, later identified as the victim, engaged in "a very intense argument" with a shorter, stockier man on the landing in front of Lewis' apartment.[2] Because it was dark and raining outside, they could not make out the face of either man. As the altercation progressed, the shorter man appeared to break a bottle over the taller man's head. He then began stabbing the taller man in the stomach with the bottle, while the taller man screamed for him to stop. This continued until Brown yelled from across the street for the men to "stop," at which point the shorter man "snapped back into, like, reality" and went inside Lewis' apartment. After the fight ended, a woman ran down the fire escape stairs from the third floor. When she reached the victim, she began pleading for help, saying, "please . . . he's unconscious. He's unconscious. He's not breathing." While she was tending to the victim, the shorter man "came back out of [Lewis'] apartment and yelled, I will kill all you," and then went back into the apartment.

When the police and paramedics arrived at the scene, they found the victim unresponsive, with multiple stab wounds to his abdomen, neck, and head. As the first officer reached the second floor landing, the defendant came out of Lewis' apartment "and started kicking [the victim]" and yelling for the police to "get [the victim]

the fuck out of here." After the defendant was subdued, both he and the victim were transported to a hospital, where the victim was pronounced dead and the defendant was treated for two minor puncture wounds to the back of his leg. The state later theorized that the defendant had accidentally stabbed himself while assaulting the victim. A toxicology screen performed at the hospital revealed that the defendant had a blood alcohol content of 0.18. Opiates, cannabinoids, and cocaine were also detected in the defendant's blood. During a search of Lewis' apartment, the police found a knife on the kitchen floor lying next to a pool of blood. The knife was later determined to have both the defendant's and the victim's DNA on it.

The defendant agreed to be interviewed by the police on two occasions, first at the hospital where he was taken after the incident and the next day at police headquarters. An audio recording of the hospital interview and a video recording of the police station interview were entered into evidence and played for the jury. Initially, the defendant denied knowing the victim. Later, however, he admitted knowing him, stating that he saw him "[a]ll the time," and that the victim and Lopez "seem like friends or whatever," but that "[h]e's not her boyfriend . . . ." The defendant also stated that the victim was "the devil" and a "son of a bitch."

The defendant asserted that he and the victim began fighting after he confronted the victim about "fucking changing the kid." The defendant stated: "He was—it was something with powder. I know it was something with powder 'cause I came in the room . . . through the back, and I said, yo, what? . . . I almost walked past the room, and I stopped and . . . looked in, and he was changing the little girl. . . . It's not his little girl. He ain't got no business in that little girl's room." The defendant later stated, "you know what, that's my godbaby. That's my—no it's not. I told you already." Over the course of the two interviews, the defendant repeatedly changed his story about what the victim was doing when he confronted him. What began with the victim putting powder on the baby ended with the defendant's claiming that the victim "was performing oral sex" on her.

The defendant informed the police that all he really remembered about the evening was "fighting. Everything went black, boom, and I'm fighting. That's it." The defendant claimed that, once the fight began, the victim "gave an eye to the rest of his crew," ten of whom "jumped" the defendant, forcing him to fight "like, five of them" at once. When asked whether Lopez could confirm his story or identify the men who jumped him, the defendant replied that Lopez would not be able to do so because "there was too many of them guys" and Lopez is "sort of an airhead. She's an airhead." The defendant stated that, when he left Lopez' apartment,

the victim and his "crew" followed him down the fire escape stairs and that he "tried to kill all of them." He stated that he "tried to get [the victim]" but "couldn't get him [because] . . . [t]here was too many of them." When asked by the police whether he had consumed any drugs or alcohol that evening, the defendant denied having done so, asserting that he was "[s]traight, straight, straight." Although he denied stabbing the victim or being in possession of a knife during the struggle, he did admit to "kicking [the victim] when the cop came."

The defendant was charged with murder in violation of § 53a-54a (a) and carrying a dangerous weapon (a knife) in violation of § 53-206 (a). Before trial, he raised the affirmative defense of extreme emotional disturbance. During the state's closing argument, the prosecutor argued that the evidence overwhelmingly established the defendant's guilt, despite some discrepancies between Lewis' testimony and the testimony of Brown and Guzman. He argued: "Some of the pieces of evidence are unclear . . . [or] conflict with other pieces. People's memories can change. People forget things. . . . And people can also describe the same event differently." The prosecutor emphasized, however, that, although Brown and Guzman thought that the killer had used a broken bottle to stab the victim, their testimony that there were only two men fighting on the landing outside Lewis' apartment and that the killer walked directly into Lewis' apartment and shut the door after stabbing the victim was powerful corroboration of Lewis' testimony and conclusively refuted the defendant's claim of fighting with up to ten men on the fire escape stairs. The prosecutor further argued that the defendant's repeated lies to the police in the aftermath of the murder was strong evidence of his consciousness of guilt.

During his closing argument, defense counsel argued that the state had failed to prove beyond a reasonable doubt that it was the defendant—as opposed to some other party—who murdered the victim.[3] In support of this contention, he pointed out, among other things, that neither Brown nor Guzman, who had witnessed the murder from approximately "fifty yards away," saw the perpetrator's face, and both described him as "short and stocky," a description he maintained did not match the defendant. Defense counsel further argued that Brown and Guzman both testified that the victim was stabbed with a broken bottle, whereas it was the state's contention that the killer used a knife. As for Lewis, the only witness to identify the defendant as the perpetrator, defense counsel argued that the jury should not credit his testimony given his "cooperation agreement" with the state,[4] his more than thirty year addiction to crack cocaine, the fact that he had been awake for three days straight before the murder, and because "one of the first things he did" after the murder was lie to the

police about whether the defendant kept belongings at his apartment.

Finally, defense counsel argued that, as a result of the defendant's high level of intoxication, he could not possibly have formed the requisite intent to commit the murder.[5] Specifically, defense counsel argued that the defendant "wasn't in a normal state of mind" that evening and that he was in fact "delusional . . . ." He further argued: "The evidence [of his delusional state] comes from the statements that [he made to the police and others] about the kids being molested, about the gang members that were upstairs. And [the state touched on the defendant's] claims [that] he was fighting ten, then two, then four, and six individuals [at once]. That's because it was a delusion. He had no idea what was going on. The child being molested . . . . [The victim] . . . putting powder on the baby. . . . No evidence of that. [The defendant] was . . . clearly [in] a delusional state." In support of this contention, defense counsel noted that at least one witness had described the defendant as "drugged the fuck out or bugged the fuck out," whereas another opined that he was clearly "on something."

After closing arguments, the trial court instructed the jury on the applicable law, including the presumption of innocence, the definition of reasonable doubt, and the state's burden to prove each and every element of the charged offenses beyond a reasonable doubt. After deliberating less than one day, the jury found the defendant guilty as charged. The trial court later sentenced him to a term of imprisonment of fifty-five years for murder and a concurrent sentence of three years of imprisonment for carrying a dangerous weapon.

On appeal, the defendant claims that two instances of prosecutorial impropriety, neither of which the defense objected to at trial, deprived him of his right to a fair trial. The first alleged impropriety occurred during the state's closing argument when the prosecutor argued that the jury could infer that Lewis' prior statements to the police, which were not in evidence, were consistent with his trial testimony because, otherwise, the defense would have used the statements to impeach him. The defendant contends that the prosecutor's argument was improper because it referred to facts not in evidence and impermissibly vouched for Lewis' credibility.

The second alleged impropriety occurred during the state's rebuttal argument, when the prosecutor invoked the principle of Occam's razor[6] in arguing that the jury should credit the state's "simple, straightforward" version of events over the defendant's "unreal, complex" story about child molestation and fighting off ten men. The defendant contends that the prosecutor's reference to Occam's razor diluted the state's burden of proof and that the two improprieties together were harmful because they "struck at the heart of the case—the credi-

bility of the only witness to claim that he saw [the defendant] stab [the victim], and the issue of reasonable doubt."

The state responds that the first argument "admittedly presents a close call" but that, ultimately, it "passes muster . . . because it was specifically based on the evidence that Lewis, Beard, and Rodriguez all had made statements to the police, but that only Beard and Rodriguez were impeached for making prior inconsistent statements . . . ." As for the second argument, the state contends that, when viewed in context of the entire trial, there is no possibility that the prosecutor's reference to Occam's razor misled or confused the jury as to the state's burden of proof. The state finally contends that, even if we assume for purposes of our analysis that the challenged arguments were improper, they did not deprive the defendant of a fair trial. We agree with the state.

The following additional facts are relevant to our resolution of the defendant's claims. At trial, the prosecutor adduced the testimony of Jorden Salas, one of the first officers to arrive at the crime scene. Salas testified that, when he reached the second floor landing, another officer on the scene was standing over the defendant and that the officer informed Salas that the defendant had just come out of Lewis' apartment. Salas stated that he and another officer immediately entered Lewis' apartment to perform a protective sweep, that the only person they encountered inside the apartment was Lewis, and that Lewis did not appear to be under the influence of drugs or alcohol. When asked what he did after completing the protective sweep, Salas responded that he "took a signed sworn statement from [Lewis] . . . ." The prosecutor replied, "[w]ell, the rules of evidence preclude us from talking about anything that he may have told you, but I do want to ask you some . . . general questions." He then proceeded to question Salas about the procedures he followed in taking Lewis' statement, how long he spent with Lewis, and what he did afterward. Salas responded that he spent approximately fifteen minutes with Lewis, that he wrote down Lewis' exact words rather than summarize them, and that, afterward, he obtained Lewis' consent to search the apartment. The prosecutor adduced similar testimony from Sergeant Joshua Bergeson, who also took a statement from Lewis on the night in question. As he had done with Salas, the prosecutor admonished Bergeson not to disclose to the jury the contents of Lewis' statement to him.

During his closing argument, the prosecutor argued that "[t]here are three eyewitnesses to this crime, [Lewis, Brown, and Guzman]. I want to talk about [Lewis'] testimony. But, before I do, let me talk a little bit about . . . Lewis himself. You had the opportunity to watch him testify, and you will judge his credibility.

. . . He has cases pending against him, and he's hoping that we will tell his sentencing judge that he testified truthfully in this case with the hope that the judge will consider that when imposing his sentence.

"His cooperation [agreement] will require you to evaluate his credibility with additional scrutiny. Please remember, however, that long before . . . Lewis picked up any criminal charges, he spoke to the police on two occasions immediately after the incident [in question], and, [on] one of those occasions, gave a sworn and written statement.

"And you saw how things work in here. If someone says something inconsistent from what they said previously, they get called out on it. That really didn't happen with . . . Lewis. I think you can conclude from your common sense that his testimony during the trial is, essentially, the same as the information he provided to the police shortly after the incident and long before he picked up any criminal charges."

Later, during his rebuttal argument, the prosecutor invoked the principle of Occam's razor when responding to an argument defense counsel had made during his closing argument: "Let me go back to the initial statement that [defense counsel] made when he began his argument. He said that the state had its version of events and that the defendant had . . . his own version of the events. I'm sure you've concluded by now that, when it comes to that scientific stuff and that math, I'm no rocket scientist. I'm no, you know, physicist of any kind.

"But there was this guy back in the, like, eleventh or twelfth century, and he was sort of a precursor to the modern physicists of today, and his name was William of Ockham. And he was trying to formulate some way to figure out when there are two competing versions of events, how do you figure out which one is correct and which one is incorrect?

"And he came up with this [theory]—and this was all in the context, obviously, of physics—and he comes up with this theory which is known as Occam's razor. And Occam's razor is, you know, when there's two competing theories of events; when there's the state's version and [the defendant's] version, how do you figure out which one is believable? Which one is credible? His theory was, you take the theory that's simple and straightforward. In other words, you take the theory that makes common sense. What theory makes common sense?

"This story of [the defendant]—these lies of two to ten people attacking [him], and [his] fighting them off with [his] fists, and disarming people, and, you know, [he] was stabbed . . . [but doesn't] know who stabbed [him]. Somebody [else] stabbed [the victim]. It could have been somebody else. It could have been this per-

son.

"I guess, now, it could have been this guy Dre . . . who was interviewed by the police shortly [afterward], [who] appeared calm, as you'll remember from the testimony. . . . [H]e was calm during all of [it]. He . . . called 911 himself. There's really no evidence that he was involved in this. It just so happens that he was described as somewhat short and somewhat stocky.

"Well, so do you believe that sort of unreal, complex story or do you believe the simple, straightforward story that makes common sense, which is that . . . Lewis saw the defendant attack [the victim] violently with [a] knife, repeatedly, and [kill] him."

As previously indicated, defense counsel did not object to either of the challenged arguments.[7] We address the defendant's contentions with respect to each of them in turn.

We begin by setting forth the legal principles governing our analysis. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . .

"It is well established that prosecutorial impropriety can occur during final or rebuttal argument. . . . To prove prosecutorial [impropriety], the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process." (Citations omitted; internal quotation marks omitted.) *State* v. *Ortiz*, 343 Conn. 566, 579–80, 275 A.3d 578 (2022).

We previously have stated that, "[w]hen making closing arguments to the jury, [counsel] must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based [on] the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case." (Internal quotation marks omitted.) *State* v. *Ciullo*, 314 Conn. 28, 37, 100 A.3d 779 (2014); see also *State* v. *Martinez*, 319 Conn. 712, 727–28, 127 A.3d 164 (2015) ("[w]hile the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment [on], or to suggest an inference from, facts not in evidence, or to present matters [that] the jury ha[s] no right to consider" (internal quotation marks omitted)).

"As a general rule, a witness' prior consistent statements are inadmissible at trial. . . . Such statements clearly are barred by the hearsay rule if sought to be used to prove the truth of the matters asserted therein . . . . The rationale [on] which this rule is based is that the witness' story is not made more probable or more trustworthy by any number of repetitions of it. . . .

"This rule, however, is not absolute. The trial court, within its discretion, may admit a prior consistent statement if offered to rehabilitate a witness who has been impeached by a prior inconsistent statement . . . by the suggestion of bias, motive, or interest arising after the time the prior consistent statement was made . . . by a claim of recent fabrication . . . or by a claim of faulty memory. . . . When a prior consistent statement is admitted under any of these exceptions, it is admitted to affect credibility only and not to establish the truth of the statement." (Citations omitted; internal quotation marks omitted.) *State* v. *Valentine*, 240 Conn. 395, 412–413, 692 A.2d 727 (1997); see also Conn. Code Evid. § 6-11 (b) ("[i]f the credibility of a witness is impeached by (1) a prior inconsistent statement of the witness, (2) a suggestion of bias, interest or improper motive that was not present at the time the witness made the prior consistent statement, or (3) a suggestion of recent contrivance, evidence of a prior consistent statement made by the witness is admissible, in the discretion of the court, to rebut the impeachment").

Additionally, "[although a] prosecutor is permitted to comment [on] the evidence presented at trial and to argue the inferences that the jurors might draw therefrom, he is not permitted to vouch personally for the truth or veracity of the state's witnesses." (Internal quotation marks omitted.) *State* v. *Albino*, 312 Conn. 763, 780, 97 A.3d 478 (2014). Similarly, "[i]t is axiomatic that prosecutors are not permitted to misstate the law or to distort the government's burden of proof . . . because such statements are likely to improperly mislead the jury." (Internal quotation marks omitted.) *State* v. *Courtney G.*, 339 Conn. 328, 357, 260 A.3d 1152 (2021).

Applying these principles to the present case, we

conclude, first, that the prosecutor's argument concerning Lewis' prior statements to the police did not improperly vouch for Lewis' credibility or reference facts not in evidence. Anticipating that defense counsel would argue that Lewis' testimony should not be credited because of his cooperation agreement and knowing that the court would instruct the jury that it must scrutinize Lewis' testimony with particular care in light of that agreement,[8] the prosecutor reminded the jurors that Lewis' cooperation agreement related to crimes he committed after he gave a sworn statement to the police about the victim's murder. The prosecutor then argued that, if Lewis had changed his account of the murder as a result of the cooperation agreement, the defense would have used his prior statements to impeach him, just as it had used Beard's and Rodriguez' prior statements to impeach them.

We are not persuaded by the defendant's assertion that this argument was based on facts not in evidence. Cf. *State* v. *Payne*, 260 Conn. 446, 456, 797 A.2d 1088 (2002) (concluding that it was improper for prosecutor to tell jury "that the defendant probably had been involved in a second robbery even though there was no evidence suggesting that to be true"). Nor did the argument directly or indirectly vouch for Lewis' credibility. Cf. *State* v. *Vazquez*, 79 Conn. App. 219, 232, 830 A.2d 261 (concluding that it was improper for prosecutor to argue that police officers "raised their hand[s] to tell the truth, and that's exactly what [they] did" (internal quotation marks omitted)), cert. denied, 266 Conn. 918, 833 A.2d 468 (2003). Three different witnesses (Lewis, Salas, and Bergeson) testified that Lewis gave statements to the police on the night of the murder. The jury was also aware that Beard and Rodriguez gave statements to the police and that the defense had used their statements to discredit them. It is this specific combination of facts—the jury's awareness of the existence of Lewis' prior statements and the defense's use of Beard's and Rodriguez' prior statements to impeach them—that convinces us that "the prosecutor's remarks [simply] underscored an inference that the jury [reasonably] could have drawn entirely on its own, based on the evidence presented [at trial]." (Internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 37, 917 A.2d 978 (2007); see also *State* v. *Courtney G.*, supra, 339 Conn. 355 ("[a]lthough a prosecutor may not express a personal opinion as to a witness' credibility, he or she . . . may ask the jurors to draw inferences that are based on their common sense and life experience" (internal quotation marks omitted)). In other words, the prosecutor asked the jurors to infer from evidence properly before them, and from their personal experience as jurors in this case, that, if Lewis had changed his story as a result of his cooperation agreement, the defense could and would have used his prior statements to discredit him.[9] For these reasons, we conclude that

the first challenged argument did not exceed the bounds of permissible argument.

We also disagree with the defendant that the prosecutor's reference to Occam's razor—the principle that " 'the simplest of competing theories should be preferred over more complex and subtle ones' "; *Brodie* v. *Workers' Compensation Appeals Board*, 40 Cal. 4th 1313, 1328 n.10, 156 P.3d 1100, 57 Cal. Rptr. 3d 644 (2007);—diluted the state's burden of proof or otherwise misled the jury as to the nature of that burden. "[W]e do not review the propriety of a prosecutor's statements in a vacuum but, rather . . .  in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Courtney G.*, supra, 339 Conn. 351. In reviewing those statements, we are also mindful that the prosecutor is allowed some rhetorical leeway in making his closing argument. See, e.g., *State* v. *Gibson*, 302 Conn. 653, 659, 31 A.3d 346 (2011) ("[I]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.)).

In the present case, it is evident that the prosecutor's reference to Occam's razor was used as a rhetorical device in response to the defense counsel's closing argument that the jury must choose between the state's and the defendant's competing "versions" of events. The prosecutor responded to defense counsel's argument, first by arguing that the defendant's constantly changing story to the police belied his claim of extreme emotional disturbance precipitated by a delusion about Lopez' daughter having been sexually abused. The prosecutor then addressed defense counsel's assertion that inconsistences in the testimony of the state's witnesses created a reasonable doubt.[10] Finally, it is clear from our review of the record that the prosecutor invoked Occam's razor in an effort to address the absurdity of defense counsel's assertion that there were "two different versions of what . . . happened that night" and that both were worthy of consideration. Specifically, the prosecutor argued that the jury should choose the version "that makes common sense" rather than the "unreal, complex story" that defense counsel himself had labeled "delusional" and entirely lacking in evidentiary support. Nothing in the prosecutor's argument expressly or implicitly suggested to the jurors that they *must* choose the simpler version of events, even if they did not find it proven beyond a reasonable doubt. See *State* v. *Murray*, Docket No. A16-2053, 2017 WL 6567651, *9 (Minn. App. December 26, 2017) (by invoking Occam's razor, "[t]he prosecutor did not make a statement that [was] contrary to the state's burden of proof or contrary to the jury's task of weighing conflicting evidence"), review denied, Minnesota Supreme Court, Docket No. A16-2053 (March 20, 2018); *State* v. *McGovern*, Docket No. 36328-7-III, 2020 WL 3468197,

*5 (Wn. App. June 25, 2020) (decision without published opinion, 13 Wn. App. 2d 1114) ("In context, the prosecutor's comments about Occam's [r]azor amounted to an argument about how to assess circumstantial evidence, not the burden of proof. The prosecutor's point was that the simplest explanation for the circumstantial evidence pointing to [the defendant's] guilt was that [the defendant] in fact stole the money. This perspective contrasted with [the defendant's] theory of the case, which was that he was the victim of an unfortunate combination of circumstances . . . ."), review denied, 196 Wn. 2d 1023, 474 P.3d 1043 (2020). Nor do we believe that the jury could have interpreted the prosecutor's argument in such a manner or ignored the trial court's explicit instructions to the contrary. See, e.g., *State* v. *Williams*, 258 Conn. 1, 15 n.14, 778 A.2d 186 (2001) ("[i]t is a fundamental principle that jurors are presumed to follow the instructions given by the judge" (internal quotation marks omitted)). We therefore reject the defendant's claim that the prosecutor's argument diluted or misled the jury as to the state's burden of proof.[11]

We note, finally, our agreement with the state that, even if the prosecutor's remarks were improper, there is no possibility that they deprived the defendant of a fair trial. "To prove prosecutorial [impropriety], the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process. . . . In weighing the significance of an instance of prosecutorial impropriety, a reviewing court must consider the entire context of the trial, and [t]he question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different [in the absence of] the sum total of the improprieties." (Citation omitted; internal quotation marks omitted.) *State* v. *Long*, 293 Conn. 31, 37, 975 A.2d 660 (2009).

To aid us in determining whether prosecutorial impropriety so infected the proceedings with unfairness as to deprive a defendant of a fair trial, this court applies the factors set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). "These factors include: the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Ortiz*, supra, 343 Conn. 580. Applying these factors here, we conclude that it is manifestly clear that the two alleged improprieties did not deprive the defendant of

a fair trial. Each occurred only once, and neither was perceived by defense counsel as being so severe as to warrant an objection. See, e.g., *State* v. *Weatherspoon*, 332 Conn. 531, 558, 212 A.3d 208 (2019) (defense counsel's failure to object to allegedly improper comments is "a strong indication that they did not carry substantial weight in the course of the trial as a whole and were not so egregious that they caused the defendant harm"); *State* v. *Ceballos*, 266 Conn. 364, 414, 832 A.2d 14 (2003) ("[defense] counsel's failure to object at trial, [although] not by itself fatal to a defendant's claim, frequently will indicate on appellate review that the challenged comments do not rise to the magnitude of constitutional error" (emphasis omitted)). Nor do we perceive them as severe. Furthermore, although no curative measures were adopted, "the absence of such measures is attributable to [defense counsel's] failure to object or request any curative instruction from the court." *State* v. *Ortiz*, supra, 581. Despite defense counsel's failure to request such an instruction, however, we are persuaded that the trial court's instructions pertaining to the jurors' exclusive role as the arbiters of credibility, the state's burden of proof, and the bedrock rule that jurors must confine themselves to the evidence in the record were more than adequate to counteract any harm resulting from the alleged improprieties. With respect to the strength of the state's case, we conclude that the state's evidence identifying the defendant as the victim's killer was compelling.[12] Although some of the witnesses' testimony conflicted in certain details, their testimony coincided in all material respects and, together with the forensic evidence, established the defendant's guilt beyond a reasonable doubt.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

[2] The record indicates that the victim was six feet, four inches tall and weighed 175 pounds at the time of his death, whereas the defendant was five feet, nine inches tall and weighed 175 pounds.

[3] Defense counsel suggested to the jury that the real killer may have been a man who lived down the street, who he claimed fit Brown's and Guzman's description of the perpetrator better than the defendant did.

[4] At trial, the state elicited testimony from Lewis that, after the victim's murder, in August, 2018, he was arrested for selling crack cocaine. In July, 2019, he reached a plea agreement with the state whereby his sentence would be suspended if he completed a drug treatment program. Lewis relapsed before completing that program and later failed to appear for sentencing. At the time of the defendant's trial, Lewis was "looking at possibly the original [sentence] recommendation, plus an additional charge for the failure to appear." Lewis testified that, although no promises were made to him, he had been told by the state that his cooperation and "truthful testimony" would be brought to the judge's attention at the time of his sentencing.

[5] With respect to the defendant's intoxication, the trial court instructed the jury in relevant part: "The statute pertaining to intoxication [provides] in pertinent part as follows: intoxication shall not be a defense to a criminal charge, but in any prosecution . . . evidence of intoxication . . . may be offered . . . whenever it is relevant to negate an element of the crime charged. . . . If you find that [the defendant] was under the influence of an intoxicant at the time of the alleged acts, you must then determine what

effect, if any, this voluntary intoxication had on his ability to form the specific intent required to commit the alleged crimes. Note that intoxication is not a defense to or an excuse for the commission of a crime. It is only relevant to negate an element of the crime charged, such as intent."

[6] The Oxford English Dictionary defines "Occam's razor" as "[t]he principle that in explaining anything no more assumptions should be made than are necessary." Oxford English Dictionary (3d Ed. 2004) (online version).

[7] Although the defendant's claims are unpreserved, "under settled law, a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test." (Internal quotation marks omitted.) *State* v. *Ortiz*, 343 Conn. 566, 579, 275 A.3d 578 (2022).

[8] During its final charge to the jury, the trial court instructed the jury in relevant part: "Lewis . . . testified in this case as [a] cooperating [witness]. A cooperating witness is someone who is currently incarcerated or is awaiting trial for some crime other than the crime involved in this case and who agrees to testify for the state.

"You must look with particular care at the testimony of cooperating witnesses and scrutinize it very carefully before you accept it. You should determine the credibility of that witness in light of any motive for testifying falsely and inculpating the accused.

"In considering the testimony of this witness, you may consider such things as the extent to which the cooperating [witness'] testimony is confirmed by other evidence, the specificity of the testimony . . . the cooperating [witness'] criminal record, any benefits received in exchange for the testimony . . . and the circumstances under which the cooperating witness initially provided the information to the police or the prosecutor, including whether the cooperating witness was responding to leading questions.

"Like all questions of credibility, this is a question you must decide based on all the evidence presented to you."

[9] The defendant contends that the prosecutor's argument was an attempt to "bypass" the rules of evidence during closing arguments. He argues that, if the prosecutor wanted to introduce the contents of Lewis' prior statements to rebut an inference that he had changed his story because he hoped for consideration in connection with pending charges, then he could have asked the trial court to allow it to do so under § 6-11 (b) of the Connecticut Code of Evidence, which permits the court, in its discretion, to admit a witness' prior consistent statement to rebut "a suggestion of bias, interest or improper motive that was not present at the time the witness made the prior consistent statement, or . . . a suggestion of recent contrivance . . . ." Conn. Code Evid. § 6-11 (b). Under slightly different facts, the defendant's argument might be persuasive, and we recommend that prosecutors seek admission of a prior consistent statement whenever they want to use it for one of the purposes sanctioned by § 6-11 (b) of the Connecticut Code of Evidence. Although the prosecutor in this case chose not to request admission of Lewis' prior statements, it is fair to assume that the prosecutor believed that the argument could be made without them on the basis of evidence already in the record. In reaching our decision, we are mindful that the prior consistent statements in this case would have been admissible to rebut the suggestion that Lewis had falsely implicated the defendant, presumably to gain favor with the state, and there has been no suggestion that the statements did not, in fact, support that inference.

[10] For example, with respect to Rodriguez' testimony, the prosecutor argued: "We put him on the [witness] stand because we believe it is our obligation to provide you with all of the potentially relevant information regarding this homicide. We offered that information with the understanding that there were going to be these inconsistences in what he said . . . in comparison to what . . . other people said . . . . But we were confident . . . that you can sort through [these] differences and figure out what the facts . . . are."

[11] We note that our decision is based on the specific facts of this case. In another case, the prosecutor's use of Occam's razor may run the risk of misleading the jury as to the state's burden of proof. To avoid any such confusion, we think it prudent for prosecutors to refrain from using Occam's razor as a rhetorical device, as there are better ways to convey to a jury that the defense's version of events is unworthy of belief.

[12] The defendant asserts that the state's case was weak, arguing that "[t]here are several different versions of [the victim's] death—none of which agree with each other." Defense counsel made a similar argument at trial,

asserting that slight deviations in the timelines or factual recalls of the state's eyewitnesses (Lewis, Lopez, Rodriguez, Guzman, and Brown) were sufficient to raise reasonable doubt. To be sure, there were discrepancies and gaps in the testimony of these five witnesses, the inevitable result of the chaos, darkness, and rain, and the extreme intoxication of two of them, Lopez and Rodriguez. Notwithstanding these inconsistencies, we believe that there was considerable overlap in their testimony and that, when their accounts were combined with the forensic evidence and the defendant's highly incriminating statements and conduct, it left no doubt as to the defendant's culpability for the victim's murder.

---