******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.*
CHRISTOPHER CALHOUN
(SC 20497)

Robinson, C. J., and McDonald, D'Auria,
Mullins, Ecker and Alexander, Js.

*Syllabus*

Convicted of murder in connection with the shooting death of the victim, the defendant appealed to this court. The defendant had been arrested several years after the shooting, after two individuals, C and K, came forward and claimed to have witnessed the defendant shoot the victim. At trial, the state's case rested almost entirely on the testimony of C and K, who were incarcerated both at the time of trial and when they first approached the police with information about the shooting. The trial court admitted into evidence the entirety of the cooperation agreements that C and K had with the state, and the prosecutor used those agreements to rehabilitate C and K during their respective direct examinations, before either witness had been impeached. Defense counsel thoroughly cross-examined C and K, including about their cooperation agreements, but the trial court precluded defense counsel from questioning K about certain details of a prior arrest, which occurred after K testified before the grand jury in the present case and while he was released on parole. The trial court also declined defense counsel's request for a jailhouse informant instruction with respect to C and K and, instead, gave the jury a special credibility instruction in which it noted that C and K had entered into cooperation agreements and urged the jury to examine their testimony with "careful scrutiny" and "particular care . . . ." On the defendant's appeal from the judgment of conviction, *held*:

1. The trial court gave an adequate special credibility instruction and did not abuse its discretion in declining to give the requested jailhouse informant instruction:

   Although the trial court's instruction was not in the exact form of the requested jailhouse informant instruction, the substance of the requested instruction was very similar to the instruction that the jury was given, the jury having been cautioned that C and K were receiving benefits from the state in return for testifying, that they might have a motive to lie, and that their testimony therefore should be examined with "careful scrutiny" and "particular care," and, of all the witnesses who testified, the trial court singled out C and K as the only individuals whose credibility warranted such treatment.

   It was no consequence that the instruction the jury was given did not explicitly mention that C and K were incarcerated or identify them as jailhouse informants because, in light of the admission into evidence of the cooperation agreements, there was no need to warn the jury about the risk that C and K might be expecting a benefit from the state when the jury knew that they were expecting such a benefit.

   Moreover, the requested instruction was poorly suited to jailhouse informants who, like C and K, were also eyewitnesses to the charged crime, as the requested instruction invited the jury to consider the extent to which the witness' testimony contained details known only by the perpetrator and the extent to which the details of the witness' testimony could be obtained from a source other than the defendant.

2. The trial court did not abuse its discretion in admitting the entirety of C's and K's cooperation agreements into evidence or in permitting the prosecutor to use those agreements during direct examination, before the witnesses had been impeached:

   The provisions in the cooperation agreements providing that, if the state's attorney's office or a judge determines that the witness is lying, then the witness will be subject to prosecution, did not serve to improperly vouch for the credibility of C and K, as those provisions did not imply

that the state or the judge knew that the witnesses were telling the truth or that the state or the judge possessed information or means, unavailable to the jury, to determine the veracity of the witnesses' testimony, and the references to prosecution in those provisions were truthfully stated and were not gratuitously repeated in the remainder of the cooperation agreements.

Moreover, because defense counsel made it clear that she intended to cross-examine C and K about the cooperation agreements, it was within the trial court's discretion to permit the prosecutor to use the cooperation agreements to rehabilitate C and K in advance, during direct examination.

3. The trial court did not abuse its discretion in precluding defense counsel from cross-examining K about certain details of his prior arrest:

The trial court properly allowed cross-examination of K on the fact that he gave the police a false name when, prior to his arrest, the police pulled over the car that he was driving, as that fact had special significance and directly related to K's truthfulness, whereas it properly precluded cross-examination with respect to other details of K's arrest, including the fact that his car smelled of marijuana and that he resisted arrest, neither of which related directly to K's truthfulness.

Notwithstanding the defendant's argument that evidence regarding the smell of marijuana coming from K's car and his resisting arrest contradicted his statement to the grand jury that he intended to give up his "criminal lifestyle," the link between that evidence and K's truthfulness was indirect at best, and the trial court reasonably could have concluded that any limited probative value of this evidence was outweighed by the potential to sidetrack the trial.

Moreover, there was no merit to the defendant's argument that the evidence surrounding the traffic stop was relevant to show that K would do anything, including falsely implicating the defendant, to avoid returning to prison, because, although the jury heard testimony that K gave a false name to the police when he was pulled over, and defense counsel was free to argue that giving false testimony was not so different, such an analogy did not extend as readily to the allegations involving marijuana and resisting arrest, and such an inference would have been too uncertain to require the trial court to admit such evidence.

Argued October 13, 2022—officially released March 7, 2023

*Procedural History*

Substitute information charging the defendant with the crime of murder, brought to the Superior Court in the judicial district of New Haven and tried to the jury before *Alander, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Kevin Smith*, assigned counsel, with whom, on the brief, was *Norman A. Pattis*, assigned counsel, for the appellant (defendant).

*Nancy L. Chupak*, senior assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, former state's attorney, *Kevin M. Black, Jr.*, former special deputy assistant state's attorney, and *Seth Garbarsky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ECKER, J. Isaiah Gantt was shot and killed in New Haven's Church Street South housing project in April, 2011. The crime went unsolved for many years, until two men, Eric Canty and Jules Kierce, came forward claiming to have been eyewitnesses to Gantt's murder. Both men identified the defendant, Christopher Calhoun, as Gantt's killer. The defendant was arrested in 2018 and charged with murder under General Statutes § 53a-54a (a). The outcome of the trial rested largely on the jury's assessment of the credibility of Canty and Kierce. Their motivations were subject to impeachment because each of them was incarcerated when they first contacted the state about the case, and they each received consideration from the state in return for testifying pursuant to cooperation agreements. The jury returned a verdict finding the defendant guilty of murder.[1] The defendant claims on appeal that the trial court made three erroneous rulings requiring reversal, namely, (1) declining to give the jury a jailhouse informant instruction, (2) admitting into evidence the entirety of Canty's and Kierce's cooperation agreements, and (3) not allowing defense counsel to cross-examine Kierce regarding certain details of a prior arrest. We affirm the judgment of conviction.

The jury reasonably could have found the following facts. Gantt and the defendant both sold drugs in the Church Street South housing project. Although they had grown up as friends, they fell out when Gantt began to accuse the defendant of stealing customers. The evening Gantt was killed, he openly confronted the defendant about stolen customers. Canty, a younger friend of the defendant, was present for this argument. The defendant told Canty to go home, but he hid nearby instead to see what would happen next.

Around this time, Kierce, a mutual friend of Gantt and the defendant, received a series of phone calls from Gantt. Gantt sounded worried and asked Kierce to bring him a handgun that was hidden in a nearby apartment. As he spoke with Gantt, Kierce could hear an argument in the background. Kierce did not immediately get the gun for Gantt but went to see what was happening. He found Gantt and the defendant standing together with Montrell "Wooly" Dobbs. The atmosphere was tense. Kierce asked Gantt if he still needed the gun. Gantt said he did, so Kierce went to retrieve it for him.

Kierce returned just in time to see the defendant shoot Gantt multiple times in the back. Canty saw the same thing from his hiding place in the alley. When the police arrived, Gantt had already died from his gunshot wounds. Later that night, Kierce encountered the defendant again, at the apartment of Latisha Parker. Although the two did not talk about the shooting, Kierce saw the defendant empty shells out of a gun and dump them

into a toilet. A few days later, Canty also encountered the defendant, who at that time admitted to Canty that he had shot Gantt.

At trial, the state's case rested almost entirely on the testimony of Canty and Kierce. There was little other evidence inculpating the defendant. Ballistics and medical evidence confirmed that Gantt had been shot and killed by a .22 caliber revolver in a manner consistent with the testimony of Canty and Kierce. One witness saw the defendant, Gantt, and Dobbs together on the evening of the murder and sensed that "something was up." Another testified that the defendant had told her that Gantt was making too much money selling drugs and that Gantt had to stop or the defendant would make him stop. Otherwise, the case depended on the testimony of the two eyewitnesses, Canty and Kierce.

Both Canty and Kierce were thoroughly cross-examined by defense counsel. The jury learned that they each had criminal records and that each had entered into a cooperation agreement with the state. These agreements were admitted into evidence. The jury also heard testimony from the defense's investigator. According to this testimony, Kierce had contacted the defense team and told them that he was lying to the state and had not seen the defendant shoot Gantt.

Ultimately, the jury needed to decide whether to credit the testimony of Canty and Kierce. The jury's verdict speaks for itself. This appeal is narrowly focused on three issues: (1) the trial court's failure to give the jury a jailhouse informant instruction; (2) its admission of the cooperation agreements; and (3) its refusal to allow cross-examination on the details of a prior arrest of Kierce.[2]

I

THE JAILHOUSE INFORMANT INSTRUCTION

The defendant claims that the trial court abused its discretion by denying defense counsel's request for a jailhouse informant instruction. Specifically, he contends that Canty and Kierce are jailhouse informants and that a special credibility instruction was therefore required by our holdings in *State* v. *Patterson*, 276 Conn. 452, 469, 886 A.2d 777 (2005), and its progeny. We conclude that the trial court provided an adequate special credibility instruction under the circumstances of this case.

A jailhouse informant is any incarcerated witness who testifies to inculpatory statements made to him by the defendant. See *State* v. *Bruny*, 342 Conn. 169, 204–205, 269 A.3d 38 (2022); see also *State* v. *Jones*, 337 Conn. 486, 501, 508, 254 A.3d 239 (2020). We have recognized that such testimony should be subject to a higher degree of scrutiny for three reasons: "(1) [the witness] ha[s] an unusually strong motive to [lie] . . . (2) confession evidence may be the most damaging

evidence of all . . . and (3) false confessions are easy to fabricate, but difficult to subject to meaningful cross-examination . . . . [F]alse confession evidence from informants is *the* leading factor associated with wrongful convictions in capital cases and a major factor contributing to wrongful convictions in noncapital cases." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Jones*, supra, 501–502. In *Patterson*, we held that the trial court must warn the jury that jailhouse informant testimony should "be reviewed with particular scrutiny and weighed . . . with greater care than the testimony of an ordinary witness." (Internal quotation marks omitted.) *State* v. *Patterson*, supra, 276 Conn. 465.

We will assume for purposes of this opinion that both Canty and Kierce should have been considered jailhouse informants.[3] We nonetheless conclude that the trial court gave an adequate special credibility instruction for both witnesses and did not abuse its discretion by declining to give the instruction requested by defense counsel. Although the trial court's instruction was not in the exact form of the jailhouse informant instruction requested, it was good enough to warn the jury that Canty and Kierce had a powerful motivation to lie and that their testimony should be reviewed with scrutiny and weighed with greater care than that of an ordinary witness.

"Our review of [an omitted jury instruction] requires that we examine the [trial] court's entire charge to determine whether it is reasonably possible that the jury could have been misled by the omission of the requested instruction. . . . If a requested charge is in substance given, the court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal." (Internal quotation marks omitted.) *State* v. *Dehaney*, 261 Conn. 336, 368, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003). "[T]he language used in the model jury instructions, although instructive . . . is not binding on this court." (Internal quotation marks omitted.) *State* v. *Ortiz*, 343 Conn. 566, 599, 275 A.3d 578 (2022).

In this case, the trial court gave the following special credibility instruction: "Two of the witnesses in this case, Eric Canty and Jules Kierce, testified that they entered into cooperation agreements with the state's attorney's office . . . . I must caution you to give careful scrutiny to the testimony of each of these witnesses in determining their credibility and the weight to give their testimony in this case. . . . In weighing their testimony, you may consider whether either witness' testimony has been influenced by that agreement. You must therefore look with particular care at the testimony of such a witness before deciding to accept it as a basis for convicting the defendant in a criminal prosecution."

The court also gave the standard general credibility instruction, explaining that, in assessing the credibility of each witness, "you may take into account a number of factors, including . . . (1) was the witness able to see or hear or know the things about which that witness testified? (2) How well was the witness able to recall and describe those things? (3) What was the witness' manner and demeanor while testifying? (4) Did the witness have an interest in the outcome of this case? (5) How much time passed before the witness came forward with the information? (6) Did the witness have any bias or prejudice concerning any party or any matter involved in the case? (7) How reasonable was the witness' testimony in light of all the evidence in the case? And (8) was the witness' testimony contradicted by what that witness said or did at another time, or contradicted by the testimony of other witnesses or by other evidence?"

Not given by the court was the jailhouse informant instruction requested by defense counsel: "[The] [s]tate's witnesses, Jules Kierce and Eric Canty, who are currently incarcerated, testified in this case as informants. At the time these witnesses first provided information to [the] police, they were also incarcerated for crimes unrelated to the crime in this case. When an informant testifies, as Mr. Kierce and Mr. Canty did here, their testimony must be examined with greater scrutiny than the testimony of an ordinary witness. You should determine the credibility of these witnesses in light of any motive that they may have [had] for testifying falsely and inculpating the accused. In considering the testimony of these two witnesses, you may consider [1] [w]hether the informants have received, been offered, or reasonably expect anything from the state . . . in exchange for their testimony that would motivate them to testify falsely against the defendant, [2] [a]ny belief they may have that these benefits are contingent [on] their ability to produce evidence of criminal conduct, [3] [a]ny other case in which the informants testified or offered statements against another individual, and whether the informants received any deal, promise, inducement or benefit in exchange for their testimony or statements, [4] [w]hether the informants have ever changed their testimony/statement, [5] [t]he extent to which their testimony is confirmed by other evidence, [6] [t]he specificity of their testimony, [7] [t]he extent to which their testimony contains details known only by the perpetrator, [8] [t]he extent to which the details of their testimony could be obtained from a source other than the defendant, [9] [t]heir criminal record[s], and [10] [t]he circumstances under which they initially provided the information to the police or prosecutor."

The substance of this requested instruction is very similar to the instruction that the jury in fact heard.

The jury was cautioned that Canty and Kierce were receiving benefits from the state in return for testifying, that they might have a motive to lie, and that their testimony should therefore be examined with "careful scrutiny . . . ." This cautionary instruction took on special force because only Canty and Kierce, of all the witnesses who testified at trial, were singled out as individuals whose credibility warranted "careful scrutiny" and "particular care . . . ." The jury also was encouraged to consider the source of the witnesses' knowledge, their potential bias, whether their testimony was corroborated by other witnesses, and whether they contradicted themselves.

There are only two material respects in which the content of the instruction the defendant requested went beyond the instruction he received. In the circumstances of this case, we conclude that neither difference misled the jury.

First, the requested jailhouse informant instruction explicitly mentions that Canty and Kierce are incarcerated criminals and identifies them as jailhouse informants. In the absence of a cooperation agreement, these facts are important because they suggest that the witnesses might be hoping for favorable treatment from the state in return for their testimony. In the context of this case, however, there was no need to warn the jury about the risk that Canty and Kierce *might* be expecting a benefit from the state because the jury knew that Canty and Kierce *were* expecting a benefit from the state. The witnesses had written cooperation agreements that had been admitted into evidence, and they each had been subject to extensive cross-examination regarding, among other things, the benefits they hoped to receive from the state in exchange for their testimony. In this respect, the trial court's instructions provided a stronger warning than the jailhouse informant instruction the defendant requested. The former reminded the jury of the reality that Canty and Kierce expected to benefit by their testimony while the latter would have merely warned about the possibility of that expectation.

Second, the requested jailhouse informant instruction invites the jury to consider "[t]he extent to which [the witnesses'] testimony contains details known only by the perpetrator" and "[t]he extent to which the details of their testimony could be obtained from a source other than the defendant . . . ." This part of the jailhouse informant instruction is well suited to most jailhouse informants, but it is poorly suited to a jailhouse informant who is also an eyewitness. Canty and Kierce both claimed to be eyewitnesses, so it would make no sense to ask the jury to consider whether the details of their testimony could be known only by the defendant. The trial court was right not to give this part of the requested instruction. Jury instructions are not

"one size fits all formulations," which is why trial courts must sometimes modify jury instructions to meet the needs of a case. (Internal quotation marks omitted.) *State* v. *Ortiz*, supra, 343 Conn. 600.

When the trial court's jury instructions are read as a whole, and taken in the context of the case, it becomes clear that the substance of the requested jailhouse informant instruction was given to the jury. Canty and Kierce both had cooperation agreements with the state pursuant to which they expected to benefit from their testimony, they were both eyewitnesses to the actual crime and could provide detailed testimony about what they observed, and they were both thoroughly cross-examined on the details they witnessed, on their criminal records, and on their cooperation agreements. In these particular circumstances, the trial court did not err in providing a cooperating witness instruction along with a general credibility instruction, instead of the jailhouse informant instruction requested by defense counsel.

## II

### THE COOPERATION AGREEMENTS

The defendant next claims that the trial court abused its discretion by admitting the entirety of Canty's and Kierce's cooperation agreements into evidence. These agreements provide that Canty and Kierce are obligated to tell the truth and may be prosecuted if they lie. The defendant contends that these provisions of the cooperation agreements constitute vouching for the witnesses and should not have been admitted. The defendant also contends that, even if these provisions could have been used to rehabilitate Canty and Kierce, the trial court abused its discretion in permitting the prosecutor to use them during direct examination, before the witness had been impeached. We disagree.

Whether and when to admit the text of a cooperation agreement presents a sensitive issue for a trial court. Understanding the terms of a cooperation agreement can help the jury to assess the credibility of the witness. See *Marquez* v. *Commissioner of Correction*, 330 Conn. 575, 610–13, 198 A.3d 562 (2019) (*Palmer, J.*, concurring). However, it is also a document authored by the state, and, as we have recently observed, trial courts must ensure that prosecutors do not gain an unfair advantage from the way the cooperation agreement is drafted. See *State* v. *Flores*, 344 Conn. 713, 736, 740, 281 A.3d 420 (2022).

Our case law has established a few rules to help guide trial courts undertaking this balancing act. First, it is well established that the prosecutor may use the text of a witness' cooperation agreement to rehabilitate that witness after they have been impeached on the basis of their cooperation with the state. See id., 738. Second, if defense counsel indicates that they intend to cross-examine the witness regarding the benefits the witness

may receive from the state in return for testifying, then the trial court has the discretion to permit the prosecutor to use the text of the agreement to rehabilitate the witness in advance, during direct examination, without waiting for defense counsel to impeach the witness. See id. Third, and regardless of whether the witness is impeached, the text of the cooperation agreement may not be used by the prosecutor to vouch for the witness. See id., 745–49.

Vouching occurs when the state expressly or impliedly attests to the credibility of a witness. See, e.g., *United States* v. *Roundtree*, 534 F.3d 876, 880 (8th Cir. 2008). Although the state would not put on a witness it did not believe, the state's confidence in its witnesses may not be stated or implied to the jury. The jurors' assessment of a witness' credibility should depend on their impression of the witness, not their faith in the probity of the state. Federal courts have identified several ways in which the text of a cooperation agreement might constitute impermissible vouching: (1) if the text in any way suggests that the prosecutor knows or believes that the witness is telling the truth; see *United States* v. *Certified Environmental Services, Inc.*, 753 F.3d 72, 86–88 (2d Cir. 2014); (2) if the text in any way suggests the existence of facts outside the record that support the witness' version of events; see *United States* v. *Benitez-Meraz*, 161 F.3d 1163, 1167 (8th Cir. 1998); or (3) if the text in any way suggests that the state has the means of determining whether the witness is lying and will use those means to ensure that the witness tells the truth. See *United States* v. *Bowie*, 892 F.2d 1494, 1498–99 (10th Cir. 1990); see also *State* v. *Flores*, supra, 344 Conn. 745–48. Vouching in any of these forms can never be presented to the jury.

Closely related to vouching is the inclusion of gratuitous references to the witness' obligation to tell the truth, or to the possible consequences of lying. Such a reference is gratuitous if it is repetitive or goes beyond simply memorializing the agreement between the witness and the state. We have noted that gratuitous references of this kind may constitute vouching in some cases. See *State* v. *Flores*, supra, 344 Conn. 749. Moreover, because gratuitous references do not shed any new light on the agreement between the witness and the state, their probative value is negligible and outweighed by their prejudicial effect. To avoid this danger, "the state must take care in drafting its cooperation agreements, and trial courts must carefully examine their language before admitting them fully into evidence." Id., 736.

The defendant contends that the following language, contained in both Canty's and Kierce's cooperation agreements, constitutes vouching: "Should it reasonably be determined by a judge of the Superior Court or the state's attorney's office that [the witness] has

given false, incomplete or misleading testimony or information . . . he shall thereafter be subject to prosecution for any state criminal offense of which this office has knowledge, including, but not limited to . . . perjury and hindering prosecution." We disagree because we do not consider this provision to be vouching.

The provision states that, if the state, or a judge, determines that the witness is lying, then the witness will be subject to prosecution. As written, the provision does not imply that the state or judge knows that the witness presently is telling the truth, or that they possess information or means, unavailable to the jury, to determine the veracity of the witness' testimony. Although conditional statements, if not carefully drafted, may vouch for a witness, this provision of the cooperation agreements does not do so. Nor do we consider the statement regarding the consequences of lying—that the witness will be subject to prosecution—to be gratuitous as drafted. A cooperation agreement may refer to the consequences of lying, as long as those consequences are accurately stated and not needlessly repeated. See *State* v. *Flores*, supra, 344 Conn. 748–49. The reference to prosecution is truthfully stated and is not gratuitously repeated in the rest of the cooperation agreement. Taken as a whole, therefore, the trial court did not abuse its discretion by admitting these cooperation agreements into evidence.

We further conclude that the trial court did not abuse its discretion by permitting the prosecutor to use the cooperation agreements to fortify the credibility of Canty and Kierce during direct examination, before they were impeached by defense counsel. As we held in *Flores*, if defense counsel makes it clear that they intend to cross-examine a witness on that witness' cooperation agreement, then the trial court has discretion to permit the state to use the text of the cooperation agreement to rehabilitate the witness in advance, during direct examination.[4] See id., 738. Defense counsel in this case made it clear that she intended to cross-examine Canty and Kierce on their cooperation agreements. The trial court therefore did not abuse its discretion in permitting the prosecutor to use the cooperation agreements during the direct examinations of Canty and Kierce.

### III

### CROSS-EXAMINATION ON PRIOR MISCONDUCT

Lastly, the defendant contends that the trial court abused its discretion in not allowing defense counsel to cross-examine Kierce about the details of a prior arrest.[5] The following factual background is relevant to this claim. Two years before trial, Kierce testified to the grand jury about the defendant's role in the murder. In this testimony, Kierce stated that he had come forward belatedly because he "wanted to do the right

thing," he "no longer wanted to be associated with the criminal lifestyle," and he "wanted to make a clean break . . . ." After his grand jury testimony, Kierce was released on parole. He violated parole by absconding from a halfway house and was later arrested during a traffic stop and returned to prison. At trial, defense counsel wanted to ask Kierce about the details of the traffic stop that lead to his capture and return to prison. Specifically, defense counsel wanted the jury to hear that Kierce initially refused to pull his car over when signaled by the police, that there was an odor of marijuana coming from Kierce's car, that Kierce initially gave a false name, and that he resisted arrest.

Outside the presence of the jury, defense counsel argued that all these details were appropriate subjects for cross-examination, because they showed that Kierce would do anything to avoid returning to prison and that he was being untruthful when he told the grand jury that he was giving up his "criminal lifestyle." The trial court ruled that defense counsel could ask Kierce about whether he was pulled over and whether he gave a false name to the police. The jury also heard from Kierce that he was returned to prison after being pulled over because he had absconded from the halfway house. The court did not allow defense counsel to ask about the other details of the arrest. We conclude that it was within the trial court's discretion to make this evidentiary ruling.

"The law in Connecticut on impeaching a witness' credibility provides that a witness may be cross-examined about specific acts of misconduct that relate to his or her veracity." *State* v. *Annulli*, 309 Conn. 482, 492, 71 A.3d 530 (2013). However, "[t]he right to cross-examine a witness concerning specific acts of misconduct is limited in three distinct ways. First, cross-examination may . . . extend [only] to specific acts of misconduct other than a felony conviction if those acts bear a special significance [on] the issue of veracity . . . . Second, [w]hether to permit cross-examination as to particular acts of misconduct . . . lies largely within the discretion of the trial court. . . . Third, extrinsic evidence of such acts is inadmissible." (Internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 206, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005); see Conn. Code Evid. § 6-6 (b), commentary.

Kierce was subject to extensive cross-examination on his criminal background, his possible bias, and his prior inconsistent statements. On the subject of the traffic stop, defense counsel was permitted to cross-examine Kierce on the fact that he was pulled over and the fact that he provided a false name. The fact that Kierce gave a false name to the police has special significance for his truthfulness, and the trial court was correct to allow cross-examination on that fact. By con-

trast, the other details of Kierce's arrest—the allegations that he pulled over slowly, smelled of marijuana, and resisted arrest—do not directly relate to his truthfulness. See, e.g., *State* v. *Ortiz*, supra, 343 Conn. 588; *Vogel* v. *Sylvester*, 148 Conn. 666, 675–76, 174 A.2d 122 (1961).

The defendant argues that these facts contradict Kierce's statement to the grand jury that he intended to give up his "criminal lifestyle." Although the trial court may have acted within its discretion had it allowed the sought after cross-examination, it did not abuse its discretion in drawing the line where it did by prohibiting testimony about the smell of marijuana and allegations of resisting arrest. A court has discretion to exclude evidence of prior misconduct if the relevance of that evidence to the issue of veracity is outweighed by its tendency to delay or confuse the litigation. See *State* v. *Annulli*, supra, 309 Conn. 494–95. Other than providing a false name to the police, the link between the details of the traffic stop and Kierce's truthfulness was indirect at best. A single arrest on such charges does not provide compelling evidence that Kierce knowingly misled the grand jury. The excluded details would have added little to the jury's overall impression of Kierce's truthfulness, which was subject to extensive impeachment by defense counsel on other grounds. The trial court reasonably could have concluded that any limited probative value was outweighed by the potential to sidetrack the trial.

For the same reasons, we reject the defendant's claim that the evidence surrounding the traffic stop was relevant to show that Kierce would do anything—including falsely implicating the defendant—to avoid returning to prison. The jury heard that Kierce gave a false name to the police when he was pulled over. The defense was free to argue that giving false testimony was not so different. But the analogy does not extend as readily to the other allegations of wrongdoing involving marijuana and resisting arrest. That inference is too uncertain to require the trial court to admit such evidence. See, e.g., *State* v. *Pinnock*, 220 Conn. 765, 782–83, 601 A.2d 521 (1992) (trial court did not abuse its discretion by precluding cross-examination on details of cooperating witness' prior conviction); *State* v. *Moye*, 214 Conn. 89, 95–97, 570 A.2d 209 (1990) (trial court did not abuse its discretion in concluding that misconduct evidence relating to witness' failure to appear and respond to subpoena showed witness' fear of committing perjury and, therefore, was relevant to his credibility). We conclude that there was no abuse of discretion in limiting the cross-examination on the details of the traffic stop.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] The defendant was sentenced to forty-five years of incarceration.

[2] The defendant appealed directly to this court pursuant to General Stat-

utes § 51-199 (b) (3).

[3] In *Bruny*, we distinguished between jailhouse informants' testimony about *statements* made by the defendant, on the one hand, and jailhouse informants' testimony about their *observations of events* relating to the crime, on the other. See *State* v. *Bruny*, supra, 342 Conn. 205–206. We held that a special credibility instruction was mandatory for the former but not for the latter. Id. In the present case, Canty testified about both his own eyewitness observations at the time of the murder and a statement the defendant made to him a few days later. See *State* v. *Jones*, supra, 337 Conn. 508 and n.14 (requiring credibility instruction for jailhouse informant's testifying both to statements made by defendant and observed events). The parties dispute whether Kierce's testimony included more than his eyewitness observations during the events leading up to the murder. There is no need to resolve this dispute because we assume, arguendo, that Canty and Kierce both should have been treated as jailhouse informants. Our decision to do so does not alter the definition of jailhouse informants set out in *Bruny* and *Jones*.

[4] *Flores* was not decided when this trial occurred, but it is nevertheless controlling on appeal. See, e.g., *State* v. *Elias G.*, 302 Conn. 39, 45, 23 A.3d 718 (2011).

[5] The defendant frames this claim as an evidentiary issue, not a constitutional violation.