******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# STATE OF CONNECTICUT *v.* TYHITT BEMBER
## (SC 20708)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Alexander and Dannehy, Js.

*Syllabus*

Convicted of felony murder, attempt to commit robbery in the first degree,
and carrying a pistol or revolver without a permit in connection with
the shooting death of the victim, the defendant appealed to this court.
On the night of the victim's murder, the defendant, armed with a .22
caliber revolver with black duct tape wrapped around its grip, was
parked at a restaurant with H in H's car. When the defendant saw the
victim walking nearby, he instructed H to follow the victim in the car.
At some point, the defendant exited the car to pursue the victim on
foot. After confronting the victim, the defendant decided to rob him,
but, when the victim resisted, the defendant shot the victim five times.
At trial, the state's case rested almost entirely on the testimony of H
and B, who were both facing charges for their involvement in another
homicide and had entered into cooperation agreements with the state.
The defendant had allegedly confessed his involvement in the victim's
murder to B, who was the defendant's close friend. Prior to trial, the
defense moved to preclude the state from introducing the cooperation
agreements during its direct examination of H and B. The trial court
granted the motion but ruled that the prosecutor would be permitted
to use leading questions to flesh out the terms of the agreements. The
defense also moved for a pretrial hearing regarding the reliability of
H's and B's proposed trial testimony pursuant to the statute (§ 54-86p)
governing the reliability and admissibility of jailhouse informant testi-
mony. Following a hearing, at which H and B testified, the trial court,
over defense counsel's objection, granted the state's motion to open the
hearing for the purpose of introducing five exhibits relating to evidence
that the parties had referenced during their arguments at the hearing.
Thereafter, the trial court found that H's and B's proposed trial testimony
was sufficiently reliable to be admitted at trial. In reaching its decision,
the trial court relied on, inter alia, its credibility assessment of H's and
B's testimony in another criminal case. At trial, the prosecutor elicited
testimony from H and B on direct examination regarding their coopera-
tion agreements, including their obligation to tell the truth under the
terms of those agreements. *Held*:

1. The defendant could not prevail on his claim that the trial court had
   abused its discretion in permitting the prosecutor to question H and B
   during direct examination regarding the specific terms of their coopera-
   tion agreements with the state:

The defendant waived this claim, as defense counsel expressly agreed that the state could use leading questions during direct examination to flesh out the terms of the cooperation agreements and H's and B's understanding of them, and, even if the claim was not waived, it still would have failed because defense counsel informed the trial court, prior to the start of the trial, that he intended to cross-examine H and B about their expectations under the cooperation agreements, and, therefore, it was within the trial court's discretion to permit the prosecutor to use the agreements to rehabilitate H and B in advance, during direct examination.

2. The defendant could not prevail on his claim that the prosecutor had impermissibly vouched for H's and B's credibility by introducing the truthfulness provisions of their cooperation agreements, eliciting testimony from H and B that their attorneys were present in the courtroom, and referencing their prior testimony in other criminal cases on behalf of the state:

This court, relying on *State* v. *Calhoun* (346 Conn. 288) and *State* v. *Flores* (344 Conn. 713), concluded that the introduction of the truthfulness provisions of H's and B's cooperation agreements did not constitute improper vouching because they did not refer to facts not in evidence, explicitly or implicitly indicate that the state had verified the accuracy of their testimony, or offer the prosecutor's personal opinion regarding the truthfulness of their testimony, and those provisions merely stated that the witnesses had an obligation to testify truthfully and explained the consequences for a breach of that obligation.

It was unnecessary for this court to decide whether the prosecutor's questions relating to H's and B's testimony in other cases and their attorneys' presence in the courtroom were improper because, even if they were, they did not deprive the defendant of a fair trial, as defense counsel did not raise any objection to these questions or ask the trial court to take any curative measures, and, accordingly, it could be inferred that defense counsel did not regard the questions as seriously prejudicial when they were posed to H and B.

Moreover, the alleged improprieties were infrequent, as the challenged questions comprised only a small portion of the prosecutor's lengthy examination of both witnesses, this court did not perceive the questions as blatantly egregious or inexcusable, and, although H's and B's testimony was central to the state's case, the state presented evidence that corroborated their testimony, including cell site data and analysis placing the defendant near the crime scene close to the time that the victim was shot and a .22 caliber revolver with black duct tape wrapped around its grip, which the defendant had given to his then girlfriend for safe keeping after the victim's murder.

3. The trial court did not abuse its discretion in opening the reliability hearing to allow the state to introduce evidence that the parties had referenced

during the hearing or in determining that H's and B's proposed trial testimony was sufficiently reliable to be admissible at trial under § 54-86p:

With respect to the trial court's opening of the reliability hearing, the defendant failed to identify any resulting prejudice, as the court found that the state had inadvertently failed to introduce the evidence referenced at the hearing and that the defendant was aware of that evidence, and as the court properly could have considered most, if not all, of the evidence under § 54-86p, even if it had not been admitted at the hearing.

With respect to the trial court's reliability determination, the trial court conducted a careful review of the record of the hearing, the legal arguments advanced by both parties, and the statutory factors enumerated in § 54-86p (a) in concluding that H's and B's proposed testimony was sufficiently reliable to be admitted at trial.

Moreover, although the trial court erroneously included its own assessment of H's and B's testimony in another case in determining that their proposed testimony was sufficiently reliable to be admitted at trial in the present case, that error was harmless because it was clear that the court would have found H's and B's testimony sufficiently reliable utilizing only permissible statutory factors under § 54-86p, as its prior credibility assessment was one of many factors that it considered in determining that the testimony was sufficiently reliable, there was nothing in the record to suggest that it was a dispositive factor or that the court's decision might have been different in its absence, and defense counsel had ample opportunity to impeach H's and B's credibility at trial and thoroughly availed himself of that opportunity through cross-examination and during closing argument.

This court instructed trial courts to rely on objective criteria, to which all parties would have access through the discovery process, in considering information disclosed pursuant to statute (§ 54-86o (a) (5)) for purposes of making a prima facie reliability determination under § 54-86p (a).

4. There was no merit to the defendant's claim that the trial court's denial of his motion to suppress a recording of a phone conversation he had had with his then girlfriend, D, while he was being held in pretrial detention on unrelated charges and to suppress the .22 caliber revolver seized by the police as a fruit of the information acquired from the recording violated his rights under the fourth amendment to the United States constitution:

The defendant failed to demonstrate that he maintained a subjective expectation of privacy in the content of his phone conversation with D, as he stipulated that, at the time of his admission to the correctional facility, he was notified and signed a waiver acknowledging that all nonprivileged calls were subject to recording and monitoring, there were

signs posted near the phone area at the correctional facility, and a recorded message played throughout his call with D, reminding him that his call was subject to recording and monitoring, and nothing about the defendant's actions in placing a call under these conditions indicated an intent to preserve the contents of the call as private.

Moreover, in the absence of such an expectation of privacy, the defendant was not entitled to suppression of the recording of the phone conversation or the .22 caliber revolver.

Argued October 27, 2023—officially released June 25, 2024

*Procedural History*

Substitute information charging the defendant with the crimes of murder, felony murder, attempt to commit robbery in the first degree, conspiracy to commit robbery in the first degree, and carrying a pistol or revolver without a permit, brought to the Superior Court in the judicial district of New Haven, where the court, *Vitale, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the case was tried to the jury before *Vitale, J.*; subsequently, the court granted the defendant's motion for a judgment of acquittal as to the charge of conspiracy to commit robbery in the first degree; verdict and judgment of guilty of felony murder, attempt to commit robbery in the first degree, and carrying a pistol or revolver without a permit, from which the defendant appealed to this court. *Affirmed.*

*James B. Streeto*, senior assistant public defender, for the appellant (defendant).

*Meryl R. Gersz*, assistant state's attorney, with whom were *John P. Doyle, Jr.*, state's attorney, and *Melissa Holmes*, assistant state's attorney, for the appellee (state).

*Opinion*

ALEXANDER, J. Following a jury trial, the defendant, Tyhitt Bember, was convicted of felony murder in violation of General Statutes § 53a-54c, attempt to commit robbery in the first degree in violation of General Stat-

utes §§ 53a-49 (a) (2) and 53a-134 (a) (2), and carrying a pistol or revolver without a permit in violation of General Statutes § 29-35.[1] On appeal,[2] the defendant claims that (1) the trial court abused its discretion in permitting the state to question two of its witnesses about their cooperation agreements with the state during direct examination and that this questioning amounted to prosecutorial impropriety, (2) the trial court abused its discretion in concluding that the testimony of the cooperating witnesses was reliable and admissible pursuant to General Statutes § 54-86p,[3] and (3) the trial court's denial of his motion to suppress the recording of a jailhouse phone call and the .22 caliber revolver seized by the police as a result of information acquired from that recording violated his rights under the fourth

[1] The jury found the defendant not guilty of the charge of murder in violation of General Statutes § 53a-54a (a). The trial court granted the defendant's motion for a judgment of acquittal as to the charge of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a) (2).

[2] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

[3] General Statutes § 54-86p provides in relevant part: "(a) In any criminal prosecution of a defendant for a violation of section . . . 53a-54c . . . upon a motion of the defendant before the start of a trial on any such offense, the court shall conduct a hearing at which hearsay or secondary evidence shall be admissible to determine whether any jailhouse witness's testimony is reliable and admissible. The court shall make a prima facie determination concerning the reliability of such testimony after evaluation of the evidence submitted at the hearing and the information or material disclosed pursuant to subdivisions (1) to (5), inclusive, of subsection (a) of section 54-86o, and may consider the following factors:

"(1) The extent to which the jailhouse witness's testimony is confirmed by other evidence;

"(2) The specificity of the testimony;

"(3) The extent to which the testimony contains details known only by the perpetrator of the alleged offense;

"(4) The extent to which the details of the testimony could be obtained from a source other than the defendant; and

"(5) The circumstances under which the jailhouse witness initially provided information supporting such testimony to . . . a prosecutorial official, including whether the jailhouse witness was responding to a leading question. . . ."

amendment to the United States constitution. We reject the defendant's claims and affirm the judgment of the trial court.

The following facts are relevant to our analysis of the defendant's claims. On the evening of December 27, 2013, the defendant was driving around New Haven with John Helwig and Melvin Younger in Helwig's car. The three men were friends and often spent time together smoking, drinking, and engaging in criminal activity. On the night of the murder, the defendant was armed with an older model .22 caliber revolver that had black duct tape wrapped around the grip. Sometime around midnight, Helwig drove the men to a Taco Bell restaurant near exit 8 on Interstate 91. While parked at the restaurant, the defendant saw the victim, Javier Martinez, walking nearby. The defendant mistook the victim for someone he did not like and with whom he previously had fought. The defendant told Helwig to follow the victim so that he could confront him. At some point, the defendant and Younger exited Helwig's car to pursue the victim on foot. When the defendant caught up to him, he realized that the victim was not the person he thought he was but decided to rob him anyway. When the victim resisted, the defendant shot him five times. The victim died at the scene. Upon returning to Helwig's car, the defendant told Helwig that he had shot the victim because the victim disrespected him during the robbery by pushing his gun out of the way.

A nearby resident found the victim's body in the street and summoned the police. Five .22 caliber bullets were later removed from the victim's body. Investigators were able to determine that four of the bullets had been fired from the same weapon. The remaining bullet was too damaged for an accurate comparison.

In 2017, after a lengthy investigation, the state charged the defendant with several offenses relating to the victim's

death. The state's case turned primarily on the testimony of two cooperating witnesses, Otis Burton, a close friend of the defendant to whom the defendant had confessed after the murder, and Helwig, who was with the defendant on the night of the murder. The state also presented cell site data and analysis placing the defendant near the crime scene close to the time that the victim was shot, and a .22 caliber revolver with black duct tape wrapped around its grip, which the defendant had given to his girlfriend for safe keeping. The bullets recovered from the victim's body and crime scene were too damaged to be directly connected to the defendant's .22 caliber revolver.

## I

The defendant first claims that the trial court abused its discretion in permitting the state to question Helwig and Burton regarding the specific terms of their cooperation agreements with the state[4] during direct examina-

---

[4] Helwig's cooperation agreement, which was identical to Burton's in all pertinent respects, provided in relevant part: "The [state] agrees to: (1) [u]pon Helwig's request, to provide information regarding his cooperation pursuant to his agreement to any government agency in any matter or to any court in any proceeding. The [s]tate will not make a specific sentence recommendation unless required to do so by the [c]ourt.

"Helwig agrees to: (1) truthfully disclose all information pertaining to his criminal activities, and/or the criminal activities of others, as these activities relate to matters about which the [state] and any investigating police officer or agency inquires of him; (2) truthfully testify before any investigatory grand jury, and/or at any trial, retrial, or other court proceeding concerning such criminal activity when requested to do so by the [state]. . . .

"It is understood that this agreement contemplates the following criminal activities, whether completed, attempted, or conspired: murder; hindering prosecution; the discharge, theft, possession and trafficking of firearms; and that it may include any other criminal activities that may arise upon further information and investigation.

"It is understood that this is not an immunity agreement and that, in providing information pursuant to this agreement, Helwig may be subject to prosecution for any applicable state criminal offense.

"It is understood that the [state], in fulfilling its obligations pursuant to this agreement, makes no promises or representations regarding the actual sentence imposed in any future matter, or the certainty of concurrent time. The disposition of such matters rests entirely with the trial court. . . .

tion. The defendant contends that the state should have been precluded from introducing the bolstering aspects of the agreements, particularly the truthfulness provisions, until after Helwig's and Burton's credibility was attacked by the defense. The defendant further contends that the state's use of the cooperation agreements during its direct examination, and the testimony elicited as a result, amounted to prosecutorial impropriety because it impermissibly vouched for the witnesses' credibility.

The state argues that the defendant waived this claim because defense counsel affirmatively agreed that the state could question Helwig and Burton about their cooperation agreements during direct examination. The state further argues that, even if the claim was not waived, the trial court did not abuse its discretion in allowing the challenged testimony under *State* v. *Calhoun*, 346 Conn. 288, 289 A.3d 584 (2023), and *State* v.

Helwig understands that the charges for which he has entered pleas carry an exposure of thirty years incarceration.

"It is understood that Helwig is obligated pursuant to this agreement to at all times give complete and truthful information and testimony. In the event that the [state] in its discretion reasonably determines that Helwig has given incomplete, false or misleading information, the agreement shall become null and void and of no further effect, and Helwig may be subject to prosecution of perjury and/or any other applicable state criminal offense relating to the giving of such information.

"It is understood that if the [state] reasonably determines that Helwig has violated any provision of this agreement, the agreement shall become null and void and of no effect. In the event that the agreement is rendered null and void, for any reason, Helwig understands that any information that he has provided pursuant to [the] agreement may be used against him in court and he agrees to waive (1) any claim in law that his statements conveying such information are subject to suppression, and (2) any statutes of limitations defense.

"It is understood that this contract embodies the entirety of the agreement between the parties, and that any amendment of, or addition to, the terms hereof shall be executed in writing that is signed by the [state], Helwig, and Helwig's attorney. By signing this agreement, Helwig acknowledges that he has carefully considered each of its provision[s], discussed each with his counsel, and has no questions or concerns relating to entering into the agreement."

*Flores*, 344 Conn. 713, 281 A.3d 420 (2022), because defense counsel informed the court, prior to the start of trial, that Helwig's and Burton's expectations under their cooperation agreements would be "front and center" in his cross-examination of them. The state further argues that, because the trial court did not abuse its discretion in permitting the state to introduce the cooperation agreements, there was no prosecutorial impropriety.

The following additional facts are relevant to the resolution of this claim. Prior to trial, the defendant moved to preclude the state "from offering [Helwig's and Burton's] cooperation agreement[s] in its case-in-chief." Defense counsel argued that the state should be precluded from presenting the agreements because the prosecutor trying the case was the sole signatory on the agreements, which was inherently bolstering of the witnesses' credibility. Defense counsel further argued that, because "[t]he expectations of the witnesses under [the cooperation] agreement[s] [would] be front and center of some portion of . . . [his] cross-examination . . . [he] should have the right to introduce [the agreements] . . . if [he] choose[s] to go down that road."

In making this argument, defense counsel acknowledged that, under *State* v. *Gentile*, 75 Conn. App. 839, 851–52, 818 A.2d 88, cert. denied, 263 Conn. 926, 823 A.2d 1218 (2003),[5] the trial court had discretion to admit

---

[5] In *Gentile*, the Appellate Court adopted the rule followed by the majority of federal appellate courts permitting courts to admit a cooperation agreement before the cooperating witness' credibility has been attacked. *State* v. *Gentile*, supra, 75 Conn. App. 851–52; see also id., 851 ("it is not improper bolstering for a prosecutor to question a witness on direct examination about [a] cooperation agreement's requirement that the witness testify truthfully to receive the benefits of the agreement"). We have not yet decided whether we agree with the Appellate Court's holding in *Gentile* on this issue, although we have held that the trial court may exercise its discretion to permit the state to question a witness about the terms of the witness' cooperation agreement during its direct examination, if defense counsel indicates that the defense intends to question the witness regarding the cooperation agreement during cross-examination. See *State* v. *Flores*, supra, 344 Conn. 748 ("[w]e

the cooperation agreements during the state's direct examination, before the cooperating witnesses' credibility was attacked. Defense counsel maintained, however, that, because Helwig's and Burton's credibility was pivotal to the success of the state's case, "this [was] the very sort of case [that] *Gentile* may have had in mind, [in which] the court ha[s] the ability to exercise its discretion and [to] say to the state, no, you don't get to offer [the agreements] in your case-in-chief. You can certainly mention [them]. . . . I don't think that's improper. But to . . . offer the document[s] [themselves] . . . especially when the [person who signed them] on behalf of the state . . . is the very [person] trying the case . . . [that is a bridge too] far. . . . [T]hat's implicit vouching that this court should prohibit . . . ."

The trial court thereafter granted the defense's request to preclude the state from introducing copies of the cooperation agreements during its direct examination. At that time, the court asked defense counsel if it correctly understood the defense's objection to the introduction of the agreements, stating in relevant part: "The [defense] has requested that the written agreement[s] be disallowed as . . . exhibit[s], but, as I understand the record, and I can be corrected shortly if I'm wrong . . . [the defense] has no objection to thorough and specific testimony by each witness as to the exact contents of the agreements and their understanding [of the agreements]. . . . There's no objection, as I understand it, to the [state's] examining the witnesses from a document not in evidence. . . .

need not decide today whether to follow the majority or the minority of jurisdictions regarding whether the admission of the agreements and their truthfulness provisions must await an attack on the witness' credibility because the trial court did not abuse its discretion under either approach"). Although *Flores* had not been decided at the time of the defendant's trial, it is controlling on appeal. See, e.g., *State* v. *Calhoun*, supra, 346 Conn. 302 n.4.

[Therefore], the state will be permitted leading questions on direct [examination] to fully [flesh] out the terms of the agreement[s]. The documents will be marked for [identification] purposes only."[6] When the trial court finished speaking, it asked defense counsel whether it had accurately conveyed for the record the defense's objection to the state's use of the cooperation agreements. Defense counsel responded, "Yes, I believe . . . that [the court has] stated [the defense's] position correctly . . . ."

Given this procedural history, we agree with the state that the defendant has waived the right to challenge the trial court's evidentiary ruling as it relates to the admission of the terms of the cooperation agreements on direct examination.[7] See, e.g., *State* v. *Hampton*, 293 Conn. 435, 449, 988 A.2d 167 (2009) ("[w]hen a party [or his counsel] consents to or expresses satisfaction

---

[6] This procedure was initially proposed by defense counsel earlier at the hearing conducted pursuant to § 54-86p in response to a question from the trial court about how the jury would be made aware of the precise terms of Helwig's and Burton's cooperation agreements. Defense counsel then affirmatively stated: "I have consented to leading questions to avoid the harm that I'm complaining about here. . . . I would agree that leading questions would be appropriate there."

[7] With respect to his other evidentiary claims, the defendant contends that the trial court abused its discretion in permitting the state to use the text of the cooperation agreements to vouch for Helwig's and Burton's credibility. The defendant additionally contends that the trial court erred in allowing the state to further vouch for their credibility by eliciting testimony from them that they previously had testified on behalf of the state in other cases and that their attorneys were present in the courtroom at the defendant's trial. Defense counsel did not object at trial to the state's questioning relating to the text of the cooperation agreements, Helwig's and Burton's prior testimony, or their attorneys' presence in the courtroom. These claims are thus unpreserved, and we decline to review them on appeal. See, e.g., *State* v. *Qayyum*, 344 Conn. 302, 312, 279 A.3d 172 (2022) ("[D]efense counsel's failure to object to those questions necessarily means that he did not articulate his claim regarding those questions with sufficient clarity to put the trial court on notice. As a result, we conclude that the defendant failed to preserve this evidentiary claim, and, therefore, we do not review it.").

with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal" (internal quotation marks omitted)). The record leaves no reasonable question that defense counsel assented to the very procedure of which the defendant now complains. Defense counsel expressly agreed that the state could use "leading questions on direct [examination] to fully [flesh] out the terms of the agreement[s]" and the witnesses' understanding of them, which is exactly what occurred. Furthermore, even if the claim was not waived, it still would fail because defense counsel informed the trial court, prior to the start of trial, that Helwig's and Burton's expectations under their cooperation agreements would be "front and center" in his cross-examination of them. See, e.g., *State* v. *Calhoun*, supra, 346 Conn. 302 ("if defense counsel makes it clear that [the defense] intend[s] to cross-examine a witness on that witness' cooperation agreement, then the trial court has discretion to permit the state to use the text of the cooperation agreement to rehabilitate the witness in advance, during direct examination").

We now turn to the defendant's claims of prosecutorial impropriety. The defendant claims that the prosecutor impermissibly vouched for Helwig's and Burton's credibility by (1) introducing the truthfulness provisions of their cooperation agreements, (2) eliciting testimony from them that their attorneys were present in the courtroom, and (3) referencing their previous testimony in other cases on behalf of the state.[8] The state

---

[8] The state argues that these claims are merely a recharacterization of the defendant's evidentiary claims. See, e.g., *State* v. *Graham*, 344 Conn. 825, 858, 282 A.3d 435 (2022). We disagree. We previously have reviewed claims relating to the admission of truthfulness provisions as claims of prosecutorial impropriety. See, e.g., *State* v. *Flores*, supra, 344 Conn. 736, 742. We also disagree with the state's contention that the defendant's vouching claims relating to Helwig's and Burton's prior testimony and their attorneys' presence in the courtroom are strictly evidentiary. Although unpreserved challenges to the use of leading questions are unreviewable when the defendant "take[s] issue with the form of the prosecutor's questions and not the information elicited"; *State* v. *Morel-Vargas*, 343 Conn. 247, 273,

maintains that no impropriety occurred and, in the alternative, that the defendant was not deprived of a fair trial. Although defense counsel did not object to many of the questions the defendant now argues constituted impropriety, this court reviews unpreserved claims of prosecutorial impropriety under *State* v. *Williams*, 204 Conn. 523, 529 A.2d 653 (1987), and *State* v. *Warholic*, 278 Conn. 354, 897 A.2d 569 (2006). In so doing, however, "we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's [question] when it was [asked] suggests that defense counsel did not believe that it was [improper] in light of the record of the case at the time." (Internal quotation marks omitted.) *State* v. *Taft*, 306 Conn. 749, 762, 51 A.3d 988 (2012). We conduct a two step inquiry in analyzing a claim of prosecutorial impropriety: "(1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial." (Internal quotation marks omitted.) Id., 761–62. "[I]n determining whether prosecutorial impropriety so infected the proceedings with unfairness as to deprive the defendant of a fair trial, this court applies the factors set forth in *State* v. *Williams*, [supra, 540]. These factors include: the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Hinds*, 344 Conn. 541, 563–64, 280 A.3d 446 (2022).

273 A.3d 661, cert. denied,      U.S.     , 143 S. Ct. 263, 214 L. Ed. 2d 114 (2022); in the present case, the defendant is not challenging the manner in which the testimony relating to the witnesses' prior testimony and their attorneys' presence at trial was elicited but, rather, is challenging the substance of that testimony.

"Vouching occurs when the state expressly or impliedly attests to the credibility of a witness. . . . Although the state would not put on a witness it did not believe, the state's confidence in its witnesses may not be stated or implied to the jury." (Citation omitted.) *State* v. *Calhoun*, supra, 346 Conn. 300. To avoid impermissible vouching, the state may not express a personal opinion about witness credibility, imply a guarantee of truthful testimony, or make suggestions to the jury on the basis of facts not in evidence. See, e.g., *United States* v. *Roundtree*, 534 F.3d 876, 880 (8th Cir. 2008). To avoid such impropriety, "the state must take care in drafting its cooperation agreements, and trial courts must carefully examine their language before admitting them fully into evidence." (Internal quotation marks omitted.) *State* v. *Calhoun*, supra, 301.

Looking first to whether recitation of the truthfulness provisions of Helwig's and Burton's cooperation agreements constituted impropriety in the first instance, we note that, in both *Calhoun* and *Flores*, this court concluded that the state's use of nearly identical cooperation agreements did not constitute improper vouching. See id.; *State* v. *Flores*, supra, 344 Conn. 748–50. The truthfulness provisions at issue in those cases and in the present case "are similar to the kind of provisions considered permissible in the federal case law discussed and cited [in *Flores*]—specifically, the provisions stating that [the witness] had a duty to 'truthfully disclose' and 'truthfully testify' and that he may be charged with perjury if he lies. Under applicable case law, these provisions do not constitute impermissible vouching because they do not refer to facts not in evidence, do not explicitly or implicitly indicate that the state has verified the accuracy of the testimony, and do not offer the prosecutor's personal opinion regarding the truthfulness of the testimony. Rather, [they] merely state that [the witness] had an obligation to testify truth-

fully—a duty all witnesses are sworn to uphold—and [to] explain the consequences for a breach of that obligation." *State* v. *Flores*, supra, 748–49; see also *State* v. *Calhoun*, supra, 301–302 (truthfulness provision that witness could be prosecuted for perjury if state later determines that witness lied under oath was not vouching because it "[did] not imply that the state or judge knows that the witness presently is telling the truth, or that they possess information or means, unavailable to the jury, to determine the veracity of the witness' testimony"). Our analysis in these cases is dispositive of the defendant's prosecutorial impropriety claim with respect to the introduction of the truthfulness provisions of Helwig's and Burton's cooperation agreements.

The defendant next claims that the prosecutor vouched for Helwig's and Burton's credibility by eliciting testimony from them that both previously had testified on behalf of the state in other cases. He argues that this testimony, "[although] not objected to, constituted vouching in effect when combined with the testimony concerning the cooperation agreements" because "[i]t suggested to the jury that the prosecutor had already verified the truth of the testimony . . . or [else] he wouldn't have used them as witnesses in subsequent proceedings." Further, the defendant contends that the prosecutor vouched for Helwig's and Burton's credibility by eliciting from them the fact that their attorneys were present in the courtroom during their testimony. The defendant asserts that the prosecutor's questioning in this regard constituted vouching because, otherwise, the jury would necessarily have to conclude that both the prosecutor and defense counsel would be "willing to sit idly by while Helwig and Burton lied under oath." We conclude that it is unnecessary to decide whether the prosecutor's questions relating to Helwig's and Burton's prior testimony and their attorneys' presence in the courtroom were improper because, even if they

were, they did not deprive the defendant of a fair trial. See, e.g., *State* v. *Hinds*, supra, 344 Conn. 563 ("even if the prosecutor's remarks were improper, there is no possibility that they deprived the defendant of a fair trial").

There is no indication in the record that the defense invited the questions relating to Helwig's and Burton's prior testimony and their attorneys' presence in the courtroom. However, defense counsel did not object, and we interpret defense counsel's lack of objection "as a strong indication that [the alleged improprieties] did not carry substantial weight in the course of the trial as a whole and were not so egregious that they caused the defendant harm." *State* v. *Weatherspoon*, 332 Conn. 531, 558, 212 A.3d 208 (2019). Although a lack of objection is not dispositive in our analysis, "[w]hen no objection is raised at trial, we infer that defense counsel did not regard the remarks as seriously prejudicial at the time the statements were made." *State* v. *Medrano*, 308 Conn. 604, 620, 65 A.3d 503 (2013). Furthermore, even though the trial court did not adopt any curative measures, "the absence of such measures is attributable to [defense counsel's] failure to object or request any curative instruction from the court." *State* v. *Ortiz*, 343 Conn. 566, 581, 275 A.3d 578 (2022).

Moreover, we do not view the prosecutor's questioning regarding Helwig's and Burton's prior testimony or their attorney's presence in the courtroom to be "blatantly egregious or inexcusable." (Internal quotation marks omitted.) *State* v. *Ciullo*, 314 Conn. 28, 59, 100 A.3d 779 (2014). The allegedly improper questions were asked in conjunction with the state's introduction of the terms of the witnesses' cooperation agreements, were isolated in nature, did not constitute significant evidence in the context of their entire testimony, and, again, resulted in no objection from defense counsel. Given this con-

text, we do not perceive the questions as blatantly egregious or inexcusable.

Nor can these instances of alleged impropriety be characterized as frequent. See, e.g., *State* v. *Felix R.*, 319 Conn. 1, 17, 124 A.3d 871 (2015) ("[i]mproper statements that are minor and isolated will generally not taint the overall fairness of an entire trial" (internal quotation marks omitted)). The challenged questions comprised only a small portion of the state's lengthy examination of both witnesses. Moreover, the few isolated questions relating to their prior testimony revealed the name and nature of the cases in which they previously had testified on behalf of the state. The prosecutor asked Helwig and Burton whether their attorneys were present in the courtroom once and did so in confirming that both witnesses were represented by counsel when they entered the pleas related to their cooperation agreements. Finally, although Helwig's and Burton's testimony was important to the state's case, the extent to which their credibility was a central issue is mitigated by the other evidence of guilt presented at trial. Specifically, both witnesses' testimony was corroborated in many respects by cell site data and analysis, which coincided with the testimony about the defendant's movements on the night of the murder, placing him close to the crime scene around the time of the shooting. The jury was also presented with evidence that the defendant had given his unique .22 caliber revolver— the same caliber weapon used to shoot and kill the victim—to his then girlfriend to hold for him shortly after the murder took place. This corroborating evidence reinforces our conclusion that, even if we assume the existence of impropriety, the defendant was not deprived of a fair trial. See, e.g., *State* v. *Weatherspoon*, supra, 332 Conn. 558 ("[W]e do not doubt that the jury's assessment of witness credibility was a significant factor in determining its verdict. But the jury was also

presented with substantial physical and testimonial evidence corroborating [the witness'] story . . . ."); *State* v. *Thompson*, 266 Conn. 440, 482, 832 A.2d 626 (2003) ("we see no reason why the nature of the evidence as circumstantial rather than direct should bear on the assessment of the strength of the state's case"). Considering all of these factors, we cannot conclude that the prosecutor's questions relating to Helwig's and Burton's testimony and their attorneys' presence in the courtroom "so infected the trial with unfairness as to make the conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Hinds*, supra, 344 Conn. 556. Accordingly, the defendant cannot prevail on any of his claims of prosecutorial impropriety.

## II

The defendant next claims that the trial court abused its discretion in concluding that Helwig's and Burton's testimony was sufficiently reliable to be admissible under § 54-86p. The defendant makes three arguments in support of this claim: (1) the court abused its discretion in opening the hearing conducted pursuant to § 54-86p (reliability hearing) to allow the state to introduce evidence corroborating Helwig's and Burton's testimony, (2) the court abused its discretion in determining that the state made a prima facie showing of reliability, as required by § 54-86p, and (3) the court improperly relied on its own credibility assessment of Helwig's and Burton's testimony in another case in concluding that their testimony was sufficiently reliable to be admissible in the present case. The state responds that the trial court did not abuse its discretion in granting the motion to open the reliability hearing and in finding Helwig's and Burton's testimony reliable under § 54-86p. With respect to the defendant's third argument, the state contends that it is not preserved because defense counsel did not object to this part of the court's ruling at

the reliability hearing, even though he had the opportunity to do so.

The following additional facts are relevant to our resolution of this claim. At the reliability hearing, Burton testified that, at the time of the victim's murder, he was sixteen years old and spent almost every day "hanging out" with a group of teenagers in the basement of an apartment building where a friend, McKinney Davis, lived. Most of the teenagers, including the defendant, were members of a New Haven street gang known as "Piru." At the time of the murder, Burton had known the defendant for approximately three years. Burton testified that the defendant often carried a revolver that had tape around the handle. It was in Davis' basement that he heard the defendant discuss the victim's murder. According to Burton, several individuals were present when this conversation occurred, including Younger, Helwig, Davis, and Torrence Gamble. The defendant told them that, on the night of the murder, he had gone out to look for someone he "had a beef with," who was in a relationship with the mother of his child. The defendant said that he did not find the person and that, when he came across the victim, whom he did not know, he decided to rob him, but "the robbery didn't go right . . . [because the victim] reached for the gun."

Burton further testified that, after the murder, New Haven police officers came to his home and told him that a confidential informant had informed them that Burton was present in Davis' basement when the defendant discussed the murder. Burton told the officers that he was wearing headphones at the time and did not hear anything. Burton testified that he lied to the officers because "it's street code . . . . Nobody likes a snitch."

In 2016, Burton was arrested for conspiracy to commit murder in connection with the murder of Gamble, who was killed because members of their gang sus-

pected him of being a snitch. Burton was also arrested for assault in the first degree in an unrelated case. Burton testified that, after his arrests, he implicated the defendant in the victim's murder and entered into plea and cooperation agreements with the state in the hope of receiving a more lenient sentence. At the time of the defendant's trial, Burton was awaiting sentencing in both the murder and assault cases. Under the cooperation agreement, his sentence exposure was capped at twenty years. Without the agreement, he could have faced up to forty-six years of incarceration.

Helwig testified that he met the defendant at the end of 2012 or the beginning of 2013 through a mutual friend. They grew so close that Helwig hired the defendant to work for his family's business. Most of the people they socialized with were affiliated with the Piru street gang, although Helwig was not a member of the gang. As the only person with a car, Helwig regularly drove gang members where they needed to go. Helwig testified that the defendant carried an older .22 caliber revolver with black tape around the grip. The gun was unique because it held more rounds than a normal revolver.

Helwig further testified that, on the night of the murder, he, the defendant, and Younger began the evening near Goffe and Orchard streets in New Haven. Later, they drove to the Taco Bell restaurant near exit 8 on Interstate 91. While parked at the restaurant, the defendant "noticed an individual that he thought he had problems with . . . and he wanted to confront [him]." They then drove down the street in the direction they thought the individual was headed. As the individual approached, the defendant and Younger got out of the car to pursue him on foot. A short time later, Helwig heard several gunshots, after which the defendant and Younger came running back to the car. According to Helwig, the defendant had his .22 caliber revolver in his hand when he entered the car. When Helwig asked the defendant what

had happened, the defendant said that, when he tried to rob the individual, "the kid tried to mush the gun out of his hand, [so] he shot him." They then drove back to Goffe Street, to the home of Rayshawn Burrows, where they hung out, smoking, drinking, and discussing the events of the evening.

When initially questioned by the police, Helwig denied any knowledge of the victim's murder. It was only after he was arrested for conspiracy to commit murder in connection with the killing of Gamble that he gave a statement to the police implicating the defendant in the victim's murder. He did so pursuant to a plea agreement that subjected him to a maximum term of incarceration of thirty years, which was considerably shorter than the sentence he would have faced without the cooperation agreement.

After Helwig and Burton testified, the trial court heard arguments from the parties. Defense counsel argued that the testimony was not sufficiently reliable to be admissible because there was absolutely no evidence corroborating any of it, the testimony itself was vague and contradictory, and there was no forensic evidence linking the defendant's .22 caliber revolver to the murder.

Following the parties' arguments, the trial court observed that § 54-86p (a) (1) provides that, in making its reliability determination, the court may consider the extent to which the witness' testimony is confirmed by other evidence. The court noted that, during their arguments, both sides had referenced evidence that they expected to be admitted at trial. The court stated that, "if counsel has . . . reached an accommodation or an agreement because counsel knows what the evidence is and what would be produced, that's fine. But the record is not going to show that . . . the evidence . . . was introduced at [this] hearing . . . ." The court further stated: "[Y]ou're all proceeding under the assump-

tion that you know what [the evidence] is because you've got the discovery, it's been referenced. I've heard about it, you made a proffer. [Defense counsel] doesn't seem to dispute it, so, as long as everybody is on board with that, that's fine with me. I just want to make sure that the record is clear that that's how [we chose to proceed]." In response, defense counsel asked whether the parties could discuss the matter in chambers.

When the parties returned to the courtroom, the trial court, over the defense's objection, granted the state's motion to open the reliability hearing for the purpose of introducing five exhibits: a police report on the victim's murder (exhibit 3), the defendant's and Helwig's arrest warrant applications (exhibits 4 and 5), the victim's autopsy report (exhibit 6), and the ballistics report on the defendant's .22 caliber revolver (exhibit 7). The court found that the state's failure to introduce this evidence was the result of "inadvertence or assumption" about the statutory requirements. The court further found that there would be "[no] undue prejudice to the defense by allowing the state to [open the hearing] just to complete the record" and that it was within the court's discretion to do so.

The next day, the trial court found that Helwig's and Burton's testimony was sufficiently reliable to be presented to the jury. In an oral ruling, the court stated that it had considered each of the factors set forth in § 54-86p (a) (1) through (5) in light of the evidence presented at the reliability hearing and the discovery provided pursuant to General Statutes § 54-86o (a) (1) through (5).[9] The court found Helwig's testimony to be

<hr>

[9] General Statutes § 54-86o (a) provides in relevant part: "In any criminal prosecution . . . the defendant may request of the prosecutorial official whether such official intends to introduce testimony of a jailhouse witness. The prosecutorial official shall promptly . . . disclose to the defendant whether the official intends to introduce such testimony and, if so, the following information and material:

"(1) The complete criminal history of any such jailhouse witness, including any charges pending against such witness, or which were reduced or dis-

reliable because, at the time of the murder, he and the defendant had been friends for approximately eighteen months and saw each other nearly every day, and, thus, "[t]he night [the murder] occurred was . . . not an isolated occasion in which they were together." The court further noted that "Helwig's description of the general location of the crime scene, the number of shots he had heard, and the description of the gun he alleges that the defendant utilized was corroborated by state's exhibits 3, 5, and 6," that, consistent with Helwig's testimony, the victim suffered multiple gunshot wounds from a .22 caliber revolver, and that historical cell site data and analysis registered the defendant's phone in the vicinity of the murder scene at approximately 11:23 p.m., further corroborating Helwig's testimony. Finally, the court noted that Helwig statements to the police implicating the defendant in the victim's murder were statements against his own penal interest and that Helwig himself had been charged in the victim's murder.

The trial court reached similar conclusions with respect to Burton, stating: "Burton . . . had a close relationship with the defendant, they were similar in

---

missed as part of a plea bargain;

"(2) The jailhouse witness's cooperation agreement with the prosecutorial official and any benefit that the official has provided, offered or may offer in the future to any such jailhouse witness;

"(3) The substance, time and place of any statement allegedly given by the defendant to a jailhouse witness, and the substance, time and place of any statement given by a jailhouse witness implicating the defendant in an offense for which the defendant is indicted;

"(4) Whether at any time the jailhouse witness recanted any testimony subject to the disclosure, and, if so, the time and place of the recantation, the nature of the recantation and the name of any person present at the recantation; and

"(5) Information concerning any other criminal prosecution in which the jailhouse witness testified, or offered to testify, against a person suspected as the perpetrator of an offense or defendant with whom the jailhouse witness was imprisoned or otherwise confined, including any cooperation agreement with a prosecutorial official or any benefit provided or offered to such witness by a prosecutorial official."

age, they associated with the same people, and [they] were fellow gang members. [Burton was] someone [in] whom the defendant would naturally confide as a result. Burton was . . . sixteen years of age at the time of the crime and the defendant's alleged admissions to him. The defendant and Burton had known each other since they were thirteen or fourteen years of age. [Burton] confirmed the defendant's association with . . . Helwig . . . [and], although . . . Burton denied knowing anything about the [victim's murder] when first approached by [the] police, citing what he called a 'street code,' . . . [h]e later provided specific information to [the] police [implicating the defendant in the victim's murder], which he has never recanted. He also described seeing the defendant in possession . . . of a .22 caliber revolver with tape on the handle."

In reaching its decision, the trial court addressed the defense's argument that Burton's testimony was unreliable because the information he provided was vague and could have come from sources other than the defendant, such as the police. The court concluded that, if Burton had acquired his information from other sources "in an effort to obtain favorable treatment . . . his account of the defendant's admissions [would] have been far more detailed and incriminating, and [would] have involved claims of multiple confessions by the defendant [and] everyone involved, or [it would have been] tailored to match [the testimony of] other witnesses."

Finally, the trial court observed: "Each of these witnesses has testified before this court on a prior occasion in [*State* v. *Bunn*, Superior Court, judicial district of New Haven, Docket No. NNH-CR15-0158844-T], and were among the witnesses that, in light of the verdict, were credited by a jury. This court found their testimony in that case to be credible." The court further observed that, "even if the state had not presented any corrobora-

tion [of the witnesses' testimony], their testimony standing alone was credible and reliable enough, and [therefore] worth[y] of consideration by the jury."

After issuing its ruling, the trial court asked both parties whether there was anything else they needed to address. Defense counsel requested "a specific ruling as to one of the claims" made during the previous day. The court issued the ruling, which is not at issue in this appeal, and indicated that it understood that defense counsel "ha[s] to make the record for any future proceedings, if there are any." The court then gave the parties an additional opportunity to raise further questions or objections before concluding the hearing.

As a preliminary matter, we set forth the standard of review. It is well established that a trial court's ruling on evidentiary matters will not be disturbed unless the court abused its discretion. See, e.g., *State* v. *Mark T.*, 339 Conn. 225, 232, 260 A.3d 402 (2021) ("[i]n determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling" (internal quotation marks omitted)). We likewise review a trial court's decision to open the evidence under the abuse of discretion standard. See, e.g., *State* v. *Allen*, 205 Conn. 370, 380, 533 A.2d 559 (1987) ("[t]he reopening of a criminal case either to present omitted evidence or to add further testimony after either of the parties has rested is within the sound discretion of the [t]rial [c]ourt" (internal quotation marks omitted)).

We disagree with the defendant that the trial court abused its discretion in granting the state's motion to open the reliability hearing to allow the state to introduce evidence that the parties had referenced during the hearing. The court found that the state's failure to introduce this evidence was merely attributable to "inadvertence" and that the defendant was aware of

the evidence the state sought to admit. See, e.g., *State v. Freeman*, 132 Conn. App. 438, 446, 33 A.3d 256 (2011) (court did not abuse its discretion in opening pretrial hearing when state "inadvertently excluded . . . testimony from the . . . hearing" and "[t]he additional testimony offered . . . [came] as no surprise to the defendant" (internal quotation marks omitted)), aff'd, 310 Conn. 370, 77 A.3d 745 (2013). We note that most, if not all, of the admitted evidence was part of the discovery turned over to the defense pursuant to § 54-86o, which, under § 54-86p (a), the court properly could have considered, even if it had not been admitted at the reliability hearing. See General Statutes § 54-86p (a) ("[t]he court shall make a prima facie determination concerning the reliability of [a jailhouse witness'] testimony after evaluation of the evidence submitted at the hearing *and the information or material disclosed pursuant to subdivisions (1) to (5), inclusive, of subsection (a) of section 54-86o*" (emphasis added)). In light of the foregoing, and because the defendant has not identified any prejudice resulting from the trial court's ruling, we cannot conclude that the trial court abused its discretion in opening the reliability hearing for the purpose of completing the record.

We also disagree with the defendant that the trial court erred in concluding that Helwig's and Burton's testimony was sufficiently reliable to be presented to the jury. Section 54-86p (a) provides in relevant part: "The court shall make a prima facie determination concerning the reliability of [a jailhouse witness'] testimony after evaluation of the evidence submitted at the hearing and the information or material disclosed pursuant to subdivisions (1) to (5), inclusive, of subsection (a) of section 54-86o, and may consider the following factors: (1) The extent to which the . . . testimony is confirmed by other evidence; (2) The specificity of the testimony; (3) The extent to which the testimony con-

tains details known only by the perpetrator of the alleged offense; (4) The extent to which the details of the testimony could be obtained from a source other than the defendant; and (5) The circumstances under which the jailhouse witness initially provided information supporting such testimony to . . . a prosecutorial official, including whether the jailhouse witness was responding to a leading question." Importantly, the statute does not provide that any one of the enumerated factors is dispositive or that any are mandatory considerations. See *State* v. *Christopher S.*, 338 Conn. 255, 288, 257 A.3d 912 (2021) ("[a]lthough corroborating evidence is included in the list [of factors in § 54-86p (a)], it is only one factor that the court may consider").

In considering Helwig's testimony, the trial court made explicit findings under subdivisions (1), (2), (3), and (5) of § 54-86p (a) in concluding that his testimony was sufficiently reliable to be admitted at trial. The court made similar explicit findings relating to Burton's testimony. Although Burton could offer very little information about the murder, the court noted that his account was largely corroborated by Helwig's testimony in that both men described what was essentially a robbery gone wrong, and both stated that the defendant did not know the victim. The court further found that Burton provided a detailed description of the alleged murder weapon and testified to having handled the weapon himself on occasion. In short, the record reveals that the court underwent a careful review of the hearing record, the legal arguments advanced by both parties, and the statutory factors enumerated in § 54-86p (a) in concluding that Helwig's and Burton's testimony was sufficiently reliable to be admissible.

We turn, therefore, to the defendant's contention that the trial court abused its discretion in considering its own assessment of Helwig's and Burton's testimony in *Bunn* in concluding that their testimony was sufficiently

reliable to be admitted in the present case. Although we agree that the trial court erroneously included this assessment in its pretrial ruling, we conclude that this error was harmless. See, e.g., *State* v. *Raynor*, 337 Conn. 527, 541, 254 A.3d 874 (2020) ("[i]n order to establish the harmfulness of a trial court ruling, the defendant must show that it is more probable than not that the improper action affected the result" (internal quotation marks omitted)).

We begin our analysis by noting that § 54-86p (a) permits a court, in making its prima facie reliability determination, to evaluate not only evidence submitted at the hearing, but also "the information . . . disclosed pursuant to . . . subsection (a) of section 54-86o . . . ." General Statutes § 54-86p (a). This includes "[i]nformation concerning *any other criminal prosecution* in which the jailhouse witness testified . . . against a person suspected as the perpetrator of an offense . . . ." (Emphasis added.) General Statutes § 54-86o (a) (5). Thus, the trial court was clearly authorized to consider "information" concerning Helwig's and Burton's participation in *Bunn*.

Although the trial court likely understood "information" to include its own prior credibility assessment, we do not interpret the statute's use of the term "information" so broadly. Section 54-86o (a) sets forth the state's disclosure obligations when it seeks to introduce testimony of a jailhouse witness in a criminal prosecution. Section 54-86o (a) (5) requires the state to disclose to the defendant information relating to the other prosecutions in which the witness may have participated on behalf of the state. This includes, if applicable, the fact that the witness has testified previously and details about how many other proceedings in which the witness has participated. It follows that the defendant could use this information in attacking the witness' credibility both at a § 54-86p reliability hearing and, potentially,

later during cross-examination at trial. Thus, the trial court's prior credibility assessment of a testifying witness in a jury trial, in which the court was not serving as the fact finder, is not relevant information under § 54-86o (a) (5). This credibility assessment of a witness could not be utilized by both parties in the same manner as the information properly discoverable under § 54-86o (a) (5), including the number of times the witness previously has testified and the verdicts in those cases.

We therefore instruct trial courts to rely on objective criteria, to which all parties would have access through the discovery process, in considering information disclosed pursuant to § 54-86o (a) (5) for purposes of making a prima facie reliability determination under § 54-86p (a). This is consistent with the language of the statute, which allows the parties and the trial court to consider the witness' participation on behalf of the state but does not include this type of collateral assessment of a witness' testimony.

However, because it is clear that the trial court would have found Helwig's and Burton's testimony sufficiently reliable to be admitted utilizing only permissible statutory factors under § 54-86p, we conclude that the error was harmless. The trial court's prior credibility assessment was one of many factors that the court considered in determining that Helwig's and Burton's testimony was sufficiently reliable to be presented to the jury. There is nothing in the record to suggest that it was a dispositive factor or that the court's decision might have been different in its absence. Moreover, defense counsel had ample opportunity to impeach Helwig's and Burton's credibility at trial and thoroughly availed himself of that opportunity through cross-examination and in closing argument, during which he cataloged every conceivable reason why their testimony should not be credited. For all of these reasons, there is no error warranting reversal of the judgment.

## III

The defendant finally claims that the trial court erred in denying his motion to suppress the recording of a phone call that he had made while incarcerated and the .22 caliber revolver that the police had seized as a result of information acquired from the recording. Although the defendant acknowledges that inmate phone calls may be monitored and recorded for purposes of prison safety, he contends that the fourth amendment to the United States constitution[10] prohibits the state from using pretrial detainee phone call recordings for investigative purposes.[11] The state argues that the defendant had no reasonable expectation of privacy in his nonprivileged phone calls, and, thus, the subsequent use of the recording did not implicate the fourth amendment.

The following additional facts are relevant to our resolution of this claim. In March, 2014, the defendant placed a phone call to his then girlfriend, Lavenia Darden, while being held in pretrial detention on unrelated charges. During the call, which was recorded and moni-

[10] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The fourth amendment's protection against unreasonable searches and seizures is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See, e.g., *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

[11] The defendant additionally claims that monitoring inmate calls "may have a chilling effect on speech" and "can give rise to first amendment concerns." Because this statement constitutes the entirety of the defendant's argument concerning this issue, we agree with the state that the claim is inadequately briefed, and, therefore, we decline to review it. See, e.g., *State* v. *Buhl*, 321 Conn. 688, 726, 138 A.3d 868 (2016) ("[The] relative sparsity [of briefing] weighs in favor of concluding that the argument has been inadequately briefed. This is especially so with regard to first amendment and other constitutional claims, which are often analytically complex.").

tored by the Department of Correction, the defendant referred to a .22 caliber firearm that he had given to Darden for safekeeping. At the time of the call, Darden lived at her grandmother's home in New Haven. In April, 2014, the Department of Correction sent the recording to the New Haven Police Department, which obtained permission from Darden's grandmother to search her residence for the firearm. During the search, the police located a small .22 caliber revolver with black tape on the handle and eight rounds of ammunition in a closet in Darden's bedroom. The next day, Darden gave a statement to the police identifying the revolver as belonging to the defendant.

Before trial, the defendant filed a motion to suppress the recording of his phone conversation with Darden as an illegal search in violation of the fourth amendment. He also sought to suppress the .22 caliber revolver and ammunition as fruits of the allegedly unlawful search. At the hearing on the motion to suppress, the defendant stipulated that, at the time of his admission to the correctional facility, he was notified and signed a waiver acknowledging that all his nonprivileged phone calls were subject to recording and monitoring. The defendant further stipulated that, at the time of his call to Darden, he was aware that the phone calls of all inmates, pretrial detainees and convicted inmates alike, were subject to recording and monitoring, and that there were signs posted near the phones reminding inmates of this policy. Finally, the defendant stipulated that, at the beginning of his call to Darden, a recorded message notified him that the call was subject to recording and monitoring, and that this message repeated at regular intervals throughout the call.

After stipulating to the foregoing facts, defense counsel argued that the defense "[did] not dispute the legitimate penological interests of the Department of Correction, as reflected in its regulations and its prac-

tice, to monitor the calls . . . of all inmates." Defense counsel further acknowledged that the Department of Correction was responsible for the protection and safety of all inmates, pretrial detainees and convicted inmates alike, and that the recording and monitoring policy furthered institutional safety concerns. Defense counsel argued, however, that, in the case of pretrial detainees still "cloaked in the presumption of innocence, unable to make bond," the Department of Correction has "no right to become adjuncts to the investigative process" and that "a presumption of privacy for pretrial detainees at least with respect to law enforcement purposes" should prevail and preclude the department from turning recordings of their phone calls over to the police.

At the conclusion of the hearing, the trial court denied the defendant's motion to suppress. The court observed that, in applying the federal constitution, courts uniformly have held that an inmate's limited privacy rights do not include a right to make unmonitored, nonprivileged phone calls. The court explained that, without a reasonable expectation of privacy, there can be no fourth amendment violation. The court further observed that, although defense counsel had argued that a distinction should be drawn between the privacy rights of pretrial detainees and convicted inmates with respect to their phone calls, he had not cited a single case in which such a distinction had been drawn, whereas the court was aware of many cases rejecting the existence of any such distinction.

We agree with the trial court that the defendant's claim is without merit. Whether the defendant had a right to privacy in his nonprivileged prison phone calls presents a question of law, over which we exercise plenary review. See, e.g., *State* v. *Houghtaling*, 326 Conn. 330, 340–41, 163 A.3d 563 (2017), cert. denied, 584 U.S. 949, 138 S. Ct. 1593, 200 L. Ed. 2d 776 (2018).

"To receive fourth amendment protection against unreasonable searches and seizures, a defendant must have a legitimate expectation of privacy in the [subject of the search]. . . . [In the absence of] such an expectation, the subsequent police action has no constitutional ramifications." (Internal quotation marks omitted.) *State* v. *Russo*, 259 Conn. 436, 441 n.7, 790 A.2d 1132, cert. denied, 537 U.S. 879, 123 S. Ct. 79, 154 L. Ed. 2d 134 (2002); see also *State* v. *Houghtaling*, supra, 341 ("[t]o determine whether a person has a reasonable expectation of privacy in an invaded place or seized effect, that person must satisfy [both the subjective and objective prongs of] the *Katz*[12] test"). "The burden of proving the existence of a reasonable expectation of privacy rests [with] the defendant." (Internal quotation marks omitted.) *State* v. *Jacques*, 332 Conn. 271, 279, 210 A.3d 533 (2019).

In *Washington* v. *Meachum*, 238 Conn. 692, 680 A.2d 262 (1996), this court held that "[t]he inmates of Connecticut's correctional institutions . . . have no reasonable expectation of privacy in their nonprivileged telephone calls and [that] those calls may be monitored and recorded." Id., 725. We concluded that, even if inmates retain a subjective privacy interest in their nonprivileged calls, "[t]he general law of privacy attendant upon incarceration, and the recognized need for institutional security, clearly do not legitimize such an expectation." Id., 724.

The defendant does not ask this court to reconsider *Meachum* but, instead, urges us to recognize a fourth amendment distinction between the privacy expectations of pretrial detainees and convicted inmates in their nonprivileged phone calls. We need not reach this issue because we conclude that the defendant in the

---

[12] *Katz* v. *United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d. 576 (1967) (Harlan, J., concurring).

present case maintained no subjective expectation of privacy. See *State* v. *Houghtaling*, supra, 326 Conn 341–42 ("In analyzing the subjective prong of the *Katz* test, we look for actions or conduct demonstrating that the defendant sought to preserve the property or location as private. . . . Although this prong is the subjective portion of the test, it does not rest solely on the defendant's actual beliefs." (Citations omitted; internal quotation marks omitted.)).

As he stipulated to at the hearing on his motion to suppress, the defendant was notified and signed a waiver acknowledging that all nonprivileged calls were subject to recording and monitoring. Further, there were signs posted near the phone area at the correctional facility and a recorded message played throughout the defendant's call with Darden, reminding him that his call was subject to recording and monitoring. Nothing about the defendant's actions in placing a call under these conditions indicates an intent to preserve the contents of the call as private. See id., 348 ("we reaffirm that courts should properly test a defendant's subjective expectations by looking for conduct demonstrating an intent to preserve [something] as private and free from knowing exposure to the view of others" (internal quotation marks omitted)). Because the defendant failed to demonstrate that he maintained a subjective expectation of privacy in the content of his phone call to Darden, "the subsequent police action ha[d] no constitutional ramifications." (Internal quotation marks omitted.) *State* v. *Correa*, 340 Conn. 619, 640, 264 A.3d 894 (2021); cf. *United States* v. *Eggleston*, 165 F.3d 624, 626 (8th Cir.) ("The defendant concedes that he agreed to the recording and monitoring of the calls, but argued that he did not consent to their use in evidence against him. We do not think that the loaf can be sliced so thin. If someone agrees that the police may listen to his conversations and may record them, all reasonable

expectation of privacy is lost, and there is no legitimate reason to think that the recordings, like any other evidence lawfully discovered, would not be admissible."), cert. denied, 526 U.S. 1031, 119 S. Ct. 1280, 143 L. Ed. 2d 373 (1999); *People* v. *Diaz*, 33 N.Y.3d 92, 99–100, 122 N.E.3d 61, 98 N.Y.S.3d 544 ("[when pretrial] detainees are aware that their phone calls are being [monitored and] recorded, all reasonable expectation of privacy in the content of those phone calls is lost, and there is no legitimate reason to think that the recordings, like any other evidence lawfully discovered, would not be admissible" (internal quotation marks omitted)), cert. denied,      U.S.    , 140 S. Ct. 394, 205 L. Ed. 2d 215 (2019). In light of the foregoing, the defendant cannot prevail on his claim that the trial court erred in denying his motion to suppress.

The judgment is affirmed.

In this opinion the other justices concurred.